OUR CASE NUMBER 2:11CV135 PPS-APR

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | : |
| | : Chapter 7 |
| TRINITY INNOVATIVE ENTERPRISES, LLC. | : BKY. NO. 09-20579(REF) |
| | : (Converted from Chapter 11) |
| Debtor. | : |
| | : |
| MARY MARTIN, as Chapter 7 | : |
| Trustee of the Debtor's Estate, | : |
| | : |
| Plaintiff, | : Adversary No. |
| | : |
| v. | : |
| | : |
| DIRECTBUY, INC., | : |
| BETA FINANCE COMPANY, INC., | : |
| UCC TOTALHOME, INC., and | : |
| JOHN DOES 1 through 10 | : |
| | : |
| Defendants | : |
| | : |

## COMPLAINT

Mary Martin, as Chapter 7 Trustee of the estate of Trinity Innovative Enterprises, LLC, by and through her attorneys, Fox Rothschild LLP, files the following complaint against DirectBuy, Inc., Beta Finance Company, Inc., and UCC Totalhome, Inc.

### Jurisdiction and Venue

1.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This adversary proceeding relates to the Chapter 7 case of the Debtor.

2.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E) and (O).

**The Parties**

4.     Plaintiff, Mary Martin (the "Trustee" or "Plaintiff") is the duly appointed Chapter 7 Trustee in the proceedings captioned as <u>In re Trinity Innovative Enterprises, LLC.</u>, Case No. 09-20579 (REF), which is pending in the United States Bankruptcy Court for the Eastern District of Pennsylvania.

5.     Defendant DirectBuy, Inc. ("DBI") is an Indiana corporation with a principal place of business at 8430 Broadway, Merrillville, IN 46410.

6.     Defendant Beta Finance Company, Inc. ("Beta") is an Indiana corporation with a principal place of business at 8430 Broadway, Merrillville, IN 46410.

7.     Defendant UCC Totalhome, Inc. ("UCC") is an Indiana corporation with a principal place of business at 8430 Broadway, Merrillville, IN 46410.

8.     Defendants John Does 1 through 10 (the "John Doe Defendants") are individuals and/or business entities who are in possession, actual and/or constructive, of property of the estate and/or who exercise dominion and control over property of the estate.

**Factual Background**

9.     DBI is a franchisor of independently owned and operated buying clubs known as DirectBuy (the "DirectBuy Club").

10.     DirectBuy clubs offer members the opportunity to purchase certain goods including, without limitation, furniture, cabinets, appliances and flooring, from manufacturers and suppliers at their prevailing prices and to pass on such savings to their members.

11.     In order to gain membership in a DirectBuy Club, a prospective member is required to sign a membership agreement prepared by DBI and pay a membership fee ranging from $3,000 to $6,000.

12.     Defendants Beta and UCC are DBI affiliates that provide financing for customers who are unable or unwilling to pay the entire membership fee up front.

13.     On June 4, 2004, DBI entered into a DirectBuy Franchise Agreement (the "Franchise Agreement") with Thomas and Joyce Giacchi (the "Giacchis").  A true and correct copy of the Franchise Agreement is attached herewith as <u>Exhibit "A"</u>.

2

14.     Pursuant to the Franchise Agreement, the Giacchis formed and operated a DirectBuy club in Allentown, Pennsylvania known as DirectBuy of Lehigh Valley.

15.     At some point subsequent to June 4, 2004, the Giacchis, with the knowledge and consent of DBI, assigned their rights and obligations under the Franchise Agreement to Trinity Innovative Enterprises, LLC ("Debtor").

16.     On June 9, 2004, the Giacchis entered into an agreement (the "Beta Finance Agreement") with Beta UCC.  A true and correct copy of the Beta Finance Agreement is attached herewith as Exhibit "B".

17.     At no time after June 9, 2004 did the Giacchi's ever execute a written assignment of the Beta Finance Agreement to Debtor.

18.     From 2004 to 2008 Debtor operated a DirectBuy franchise.

19.     In or around 2008, Debtor began to experience financial difficulties.

20.     As a result of said difficulties, on or about June 6, 2008, DBI terminated the Franchise Agreement.

21.     By reason of the termination, DBI effectively acquired complete control over Debtor's marks, business affairs and assets such that Debtor could no longer operate the business without DBI's consent.

22.     Although DBI terminated the Franchise Agreement, between June 6, 2008 and March 6, 2009, DBI did not cause Debtor's Direct Buy franchise to de-flag.

23.     Instead, DBI instructed Debtor to seek a financially worthy substitute franchisee to acquire Debtor's rights and obligations under the Franchise Agreement

24.     During this time, DBI caused Debtor to continue to accept DBI services.

25.     During this time, DBI caused Debtor to become more and more insolvent

26.     During this time, DBI exercised complete dominion and control over Debtor's financial affairs to the point where Debtor became a mere instrumentality of Defendant DBI.

3

27.     During this time, Defendants Beta and UCC withheld moneys which said defendants owed to Debtor and remitted said funds to DBI.

28.     During this time, Defendants encouraged Debtor to actively seek and accept new members into Debtors DirectBuy Club, all of which created revenue and/or income for Defendants and increased Debtor's liabilities.

29.     By reason of said control, Defendants caused the Debtor to make preferential pre-petition payments to DBI at a time when Debtor was insolvent.

30.     On March 6, 2009 (the "Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code")

31.     From March 6, 2009 through July 13, 2009 Debtor operated as a debtor-in-possession.

32.     During this period, all of which is post-petition, Defendants took and/or applied certain moneys due and owing to Debtor as against Debtor's alleged indebtedness to Defendants including, without limitation, the following:

    (a)     On March 11, 2009 DBI applied $5,301.08 as a credit against services allegedly rendered by DBI to Debtor between October 17, 2008 and October 24, 2008 [Docket # 100 at p. 15, ¶ 61(a)];

    (b)     On March 18, 2009, DBI applied $17,006.14 as a credit against services allegedly rendered by DBI to Debtor for services rendered in or around August 2008 [Docket # 100 at p. 15, ¶ 61(b)]; and

    (c)     DBI, upon information and belief, has "withheld other funds that are purportedly 'due' the Debtor post petition" in an unspecified amount for unspecified services rendered. [Docket # 100 at p. 16, ¶ 63].

33.     On July 13, 2009, this Court determined that the Franchise Agreement had been terminated prior to the Petition Date.

34.     On October 7, 2009, this case was converted from Chapter 11 to Chapter 7.

35.     The exact amount of funds taken and applied by Defendants is undetermined as of this date.

## COUNT I – Request for Accounting

36.     The Trustee incorporates by reference the allegations in the preceding paragraphs of the complaint as though the same were set forth herein in full.

37.     The Trustee seeks an accounting as to all fees charged and collected by Defendants either from or on account of Debtor for a period of time starting one (1) year prior to the Petition Date up through and including the present.

**WHEREFORE**, the Trustee seeks an Order directing Defendants to provide the Trustee with a full and complete accounting.

## COUNT II - Turnover of Property of the Estate

38.     The Trustee incorporates by reference the allegations in the preceding paragraphs of the complaint as though the same were set forth herein in full.

39.     Section 541 of the Bankruptcy Code defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Section 542 of the Bankruptcy Code gives a trustee the power to seek turnover of all property of the debtor's estate.  11 U.S.C. § 542.  Section 542 states, in pertinent part, that:

> an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of the title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a).

40.     This section requires that any property of a debtor's estate held by any entity must be turned over to the trustee.  In re Allegheny Label, Inc., 128 B.R. 947, 954 (Bankr. W.D. Pa. 1991); In re Express America, Inc., 130 B.R. 196, 198 (W.D. Pa. 1991), Staats v. Meade (In re Meade), 84 B.R. 106, 108 (Bankr. S.D. Ohio 1988) (characterizing funds held in bank account for benefit of another as property of the estate recoverable under section 542).

5

41.     The Trustee believes and therefore avers that Defendants are in possession of property of the estate within the meaning of Bankruptcy Code section 541.

42.     Under Section 542 of the Bankruptcy Code, Defendants are required to turnover said estate property to the Trustee.

**WHEREFORE**, the Trustee requests judgment in her favor and against Defendants in such amount as may be established together with costs and any other relief deemed just and appropriate.

## COUNT III - Preference

43.     The Trustee incorporates by reference the allegations in the preceding paragraphs of the complaint as though the same were set forth herein in full.

44.     At all times relevant hereto, Defendants were "creditors" of Debtor within the meaning of Section 101(10) of the Bankruptcy Code.

45.     At all times relevant hereto, Debtor made certain "transfers" to Defendants within the meaning of Section 101(54) of the Bankruptcy Code.

46.     Said transfers benefited the Defendants.

47.     Said transfers were made while Debtor was insolvent.

48.     Some of the transfers were made on or within 90 days prior to the Petition Date.

49.     Some of the transfers were made on or within one (1) year prior to the Petition Date and are avoidable due to Defendant's status as a non-statutory insider within the meaning of the Bankruptcy Code.

50.     Each of the transfers enabled Defendants to receive more than they would have received under the Bankruptcy Code had the transfers had not been made.

51.     Each of the transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from Defendants pursuant section 550(a) of the Bankruptcy Code.

**WHEREFORE**, the Trustee seeks a judgment pursuant to sections 547(b), 550 and 551 of the Bankruptcy Code: (a) avoiding and preserving the transfers; (b) directing that the transfers be set aside; (c) recovering the transfers, or the value thereof, for the benefit of the estate of the Debtor; and (d) such other relief as the Court may deem just and equitable under the circumstances.

## RESERVATION OF RIGHTS

52.     The Trustee continues to investigate allegations that Defendants, _inter alia_, received substantial undisclosed rebates and discounts from manufacturers and suppliers that were not passed on as savings to DirectBuy franchisees and customers.  Consequently, the Trustee reserves her right to amend the Complaint as provided in Rule 15 of the Federal Rules of Civil Procedure and the concomitant provision of the Bankruptcy Rules.

Respectfully submitted,

FOX ROTHSCHILD LLP

_/s/ Edward J. DiDonato_
Edward J. DiDonato, Esquire
2000 Market Street, 20th Floor
Philadelphia, PA  19103
(215) 299-2000 (tel)
edidonato@foxrothschild.com
Counsel to Trustee

- and -

Ely Goldin, Esquire
10 Sentry Parkway, Suite 200
Post Office Box 3001
Blue Bell, PA 19422
(610) 397-6509 (tel)
egoldin@foxrothschild.com
Co-counsel to Trustee

Dated:  July 12, 2010.

LN1 1098481v1 07/12/10

# *EXHIBIT A*

DIRECTBUY
FRANCHISE AGREEMENT
THOMAS AND JOYCE GIACCHI

# DIRECTBUY
# FRANCHISE AGREEMENT

Thomas and Joyce Giacchi
FRANCHISEE

June 9, 2004
DATE OF AGREEMENT

10/03
3692043.6/Franchise Agreement 10/30/03

TABLE OF CONTENTS

Page

1. INTRODUCTION ................................................................................. 1
   1.01   DirectBuy Centers ................................................................... 1
   1.02   Your Acknowledgments ........................................................... 1
   1.03   Your Representations ............................................................... 1
   1.04   Certain Definitions ................................................................. 1
2. GRANT OF RIGHTS ......................................................................... 3
   2.01   Grant of Franchise ................................................................. 3
   2.02   Marketing Area ..................................................................... 3
   2.03   Selection of Location of Center ............................................... 4
   2.04   Our Reservation of Rights ....................................................... 4
   2.05   Disclaimer ........................................................................... 4
3. FEES ............................................................................................... 4
   3.01   Initial Franchise Fee .............................................................. 4
   3.02   Royalty Fees ......................................................................... 5
   3.03   Marketing and Legislative Fund Contributions .......................... 5
   3.04   Method of Payment ............................................................... 5
   3.05   Interest On Late Payments ...................................................... 6
   3.06   Security Deposit .................................................................... 6
   3.07   Application of Payments ......................................................... 7
4. TRAINING AND ASSISTANCE ......................................................... 7
   4.01   Initial Training Program ......................................................... 7
   4.02   Supplemental Training Programs .............................................. 7
   4.03   Marketing and Merchandise Ordering Materials ........................ 7
   4.04   Operating Manual .................................................................. 8
   4.05   On-Going Guidance ............................................................... 8
5. DEVELOPMENT OF THE CENTER .................................................... 8
   5.01   Lease of Premises of the Center .............................................. 8
   5.02   Development and Opening of the Center .................................... 8
6. CENTER OPERATING STANDARDS ................................................. 9
   6.01   Memberships ......................................................................... 9
   6.02   Authorized Merchandise ........................................................ 10
   6.03   Merchandise Funds ................................................................ 10
   6.04   Financial Responsibility Requirements ..................................... 11
   6.05   Appearance of the Center ....................................................... 11
   6.06   Standards and Procedures ....................................................... 12
   6.07   Compliance With Laws ........................................................... 12
   6.08   Personnel ............................................................................. 12
   6.09   Insurance .............................................................................. 13
   6.10   Member Prices ...................................................................... 13
   6.11   Credit Card Sales .................................................................. 13
   6.12   Websites/Internet Sales .......................................................... 13
7. MARKETING AND ADVERTISING .................................................... 14
   7.01   Marketing and Legislative Fund .............................................. 14
   7.02   Your Advertising ................................................................... 15
8. RECORDS AND REPORTS ................................................................. 15

10/03
3692043.6/Franchise Agreement 10/30/03

|  |  |  |
|---|---|---|
| 8.01 | Records | 15 |
| 8.02 | Periodic Reports | 15 |
| 9. | INSPECTIONS AND AUDITS OF YOUR CENTER | 16 |
| 9.01 | Inspections | 16 |
| 9.02 | Audits | 16 |
| 10. | TRADEMARKS | 16 |
| 10.01 | Ownership of the Marks | 16 |
| 10.02 | Use of the Marks | 16 |
| 10.03 | Discontinuance of Use of Marks | 17 |
| 10.04 | Notification of Infringements and Claims | 17 |
| 10.05 | Indemnification of Franchisee | 17 |
| 11. | RESTRICTIVE COVENANTS | 17 |
| 11.01 | Confidential Information | 17 |
| 11.02 | In-Term Covenants | 18 |
| 11.03 | Information Exchange | 18 |
| 11.04 | Post-Term Covenants | 18 |
| 12. | YOUR ORGANIZATION AND MANAGEMENT | 18 |
| 12.01 | Organizational Documents | 18 |
| 12.02 | Disclosure of Ownership Interests | 19 |
| 12.03 | Operating Partner/Management of Center | 19 |
| 13. | TRANSFER OF AGREEMENT | 19 |
| 13.01 | Transfer by Franchisee Subject to Approval | 19 |
| 13.02 | Conditions for Approval | 20 |
| 13.03 | Special Transfers | 21 |
| 13.04 | Death or Disability of Franchisee | 21 |
| 13.05 | Franchisor's Right of First Refusal | 21 |
| 13.06 | Franchisee Bankruptcy | 22 |
| 13.07 | Transfer by Franchisor | 22 |
| 14. | TERMINATION OF AGREEMENT | 22 |
| 14.01 | Termination Upon Completion of Training | 22 |
| 14.02 | Immediate Termination | 23 |
| 14.03 | Termination Upon Notice | 23 |
| 15. | RENEWAL RIGHTS | 24 |
| 15.01 | Your Right To Buy a Successor Franchise | 24 |
| 15.02 | Notices | 25 |
| 15.03 | Agreements | 25 |
| 15.04 | Your Right to Sell | 25 |
| 16. | EFFECT OF TERMINATION OR EXPIRATION | 25 |
| 16.01 | Payment of Amounts Owed to Us | 25 |
| 16.02 | Discontinue Use of Marks and System | 25 |
| 16.03 | Our Right to Retrieve Materials | 26 |
| 16.04 | Our Right to Solicit Your Members | 27 |
| 16.05 | Our Option to Purchase Remaining Memberships | 27 |
| 16.06 | Continuing Obligations | 27 |
| 17. | RELATIONSHIP OF THE PARTIES | 27 |
| 17.01 | Independent Contractors | 27 |
| 17.02 | Indemnification | 28 |
| 17.03 | Taxes | 28 |
| 18. | MISCELLANEOUS | 28 |

- ii -

| | | |
|---|---|---|
| 18.01 | Governing Law | 28 |
| 18.02 | Exclusive Jurisdiction | 29 |
| 18.03 | Injunctive Relief | 29 |
| 18.04 | Costs and Attorneys' Fees | 29 |
| 18.05 | Limitations on Legal Claims | 29 |
| 18.06 | Severability and Substitution of Provisions | 29 |
| 18.07 | Waiver of Obligations | 30 |
| 18.08 | Exercise of Rights | 30 |
| 18.09 | Construction | 30 |
| 18.10 | Covenant of Good Faith | 31 |
| 18.11 | Approvals and Consents | 31 |
| 18.12 | Notices and Payments | 31 |
| 18.13 | Receipt of Offering Circular and Agreement | 31 |

10/03
3692043.6/Franchise Agreement 10/30/03

## DIRECTBUY
## FRANCHISE AGREEMENT

THIS AGREEMENT is made and entered into this ___9ͭ ͪ___ day of ___June, 2004,___ by and between **UCC TOTALHOME, INC.** ("Franchisor" or "we"), an Indiana corporation, with its principal place of business located at 8450 Broadway, Merrillville, Indiana 46410 and Thomas and Joyce Giacchi Franchisee" or "you"), a(n) _____
_____, whose principal address is 9 Stone Creek Lane, Whitehouse Station, NJ 08889

1.    **INTRODUCTION.**

**1.01  DirectBuy Centers.** We franchise DirectBuy$^{SM}$ centers, which are buyer clubs that offer and sell memberships to the general public and provide merchandise ordering and other related services to their members. As a result of spending time, skill, effort and money, we have developed a comprehensive system for operating DirectBuy centers, which includes trademarks, showroom design and layout, membership marketing and sales techniques, merchandise ordering systems, recruiting, training and motivational techniques for personnel, and operational and business standards and policies. We may improve or otherwise change the System from time to time.

**1.02    Your Acknowledgments.** You have read this Agreement and our franchise offering circular. You understand the terms of this Agreement and accept them as being reasonably necessary to maintain the uniformity of our high standards of integrity and service at all DirectBuy centers in order to protect the goodwill of the Marks and the confidentiality of the System. You have conducted an independent investigation of the business contemplated by this Agreement and recognize that an investment in a DirectBuy center involves business risks, that the success of the venture is largely dependent on your own business abilities, efforts and financial resources, and that the nature of DirectBuy centers may change over time. You acknowledge that we have no obligation to finance the sale of memberships for your Center, unless we or one of our Affiliates has signed a written agreement to do so. You have not received or relied on any guaranty or assurance, express or implied, as to the revenues, profits or success of the business venture contemplated by this Agreement.

**1.03    Your Representations.** You represent and warrant that neither you nor any of your Owners has made any untrue statement of any material fact or has omitted to state any material fact in obtaining the rights granted hereunder. You recognize that we have approved your franchise application in reliance on all of the statements you and your Owners have made in connection therewith.

**1.04    Certain Definitions.** The terms listed below have the meanings which follow them and include the plural as well as the singular. Other terms are defined elsewhere in this Agreement in the context in which they arise.

"Actual Service Charges" - The gross amount you charge to members of your Center for
any products or services whatsoever, including charges for the submission and processing
of merchandise orders and handling of merchandise, but excluding: (a) new and renewal
membership fees and fees for renewal options; (b) sales, use, service or excise taxes
collected and paid to the appropriate taxing authorities; (c) payment for the purchase of
merchandise at your actual cost of purchasing such merchandise; and (d) freight charges.

"Affiliate" - Any person or entity that directly or indirectly owns or controls the referenced
party, that is directly or indirectly owned or controlled by the referenced party, or that is
under common control with the referenced party. The term "control" means the possession,
directly or indirectly, of the power to direct or cause the direction of the management and
policies of an entity, whether through ownership of voting securities, by contract or
otherwise.

"Competitive Business" - Any buyer club business or any other business that is the same as
or similar to the DirectBuy concept, as it evolves or changes over time. Restrictions in this
Agreement on competitive activities do not apply to: (a) the ownership or operation of other
DirectBuy centers that are licensed or franchised by us or any of our Affiliates; or (b) the
ownership of shares of a class of securities that are listed on a stock exchange or traded on
the over-the-counter market and that represent less than five percent (5%) of that class of
securities.

"Confidential Information" - Our and our Affiliates' proprietary and confidential
information relating to the operation of DirectBuy centers, including: (a) marketing,
solicitation and sales techniques for prospective members; (b) merchandise ordering
procedures; (c) the identity of suppliers and pricing and other information about their
products and services; (d) techniques for recruiting, training and motivating sales
personnel; and (f) computer programs and systems.

"DirectBuy centers" - Buyer club businesses which we or any of our Affiliates own, operate
or franchise and which use the System.

"Immediate Family" - Spouse, parents, brothers, sisters and children, whether natural or
adopted.

"Internet" - All communications between computers and between computers and television,
telephone, facsimile and similar communications devices, including the World Wide Web,
proprietary online services, E-mail, news groups and electronic bulletin boards.

"Marketing Area" -- The geographic area so designated in Schedule A.

"Marks" - Our and our Affiliates' current and future trademarks, service marks, and trade
dress used to identify the services and/or products offered by DirectBuy centers, including
the marks DirectBuy$^{SM}$ (word mark) and DirectBuy$^{SM}$ (design mark).

"Operating Manual" - Our confidential operating manual, as amended from time to time, which may consist of one or more manuals, containing our mandatory and suggested standards and operating procedures relating to the development and operation of DirectBuy centers and other information relating to your obligations under this Agreement. The term "Operating Manual" also includes alternative or supplemental means of communicating such information to you that are labeled as being part of the Operating Manual, including bulletins, videotapes, audio tapes, compact discs, computer diskettes, CD roms and electronic communications.

"Operating Partner" - The individual so designated in Schedule C.

"Owner" - Each person who has a direct or indirect legal or beneficial ownership interest in Franchisee, if you are a business corporation, partnership, limited liability company or other legal entity.

"Premises" - The location selected pursuant to Section 2.03.

"System" - The business methods for operating DirectBuy centers, which include the Marks, certain Confidential Information, showroom design and layout, and operating and business standards and policies, all of which we may improve, further develop or otherwise modify from time to time.

"Transfer the Franchise"  - or similar words - The voluntary or involuntary, direct or indirect, sale, assignment, transfer or other disposition of this Agreement, any right under this Agreement, or any form of ownership interest in Franchisee or the assets, revenues or income of your Center, including:  (1) any transfer, redemption or issuance of a legal or beneficial ownership interest in the equity of Franchisee; (2) any merger or consolidation of Franchisee, whether or not Franchisee is the surviving entity; (3) any transfer in, or as a result of, a divorce, insolvency, corporate, limited liability company or partnership dissolution proceeding or otherwise by operation of law; (4) any transfer upon the death of Franchisee or any Owner of Franchisee, by will, declaration of or transfer in trust or under the laws of intestate succession; or (5) any foreclosure upon your Center or the transfer, surrender or loss by Franchisee of possession, control or management of the Center.

## 2.    GRANT OF RIGHTS.

**2.01    Grant of Franchise**.  Subject to the terms of this Agreement, we grant you the right, and you assume the obligation, to operate a DirectBuy center at the Premises selected pursuant to Section 2.03 ("your Center") and to use the System solely in connection therewith, for a term of 12 years, starting on the date of this Agreement (the "Term").  You may not conduct the business of your Center or use the System anywhere other than the Premises, nor relocate your Center, without our consent.

**2.02    Marketing Area**. Provided you are in compliance with this Agreement, we agree not to operate, nor to grant a franchise to operate, a DirectBuy center that is located within the Marketing Area.  You have the non-exclusive right to market, solicit and sell memberships in your

Center to persons residing within the Marketing Area. You may not market, solicit or sell memberships in your Center to persons residing outside of the Marketing Area or to groups in excess of 25 persons residing within or outside the Marketing Area without our consent.

      **2.03**   **Selection of Location of Center.** Within a reasonable period of time, not to exceed 45 days after the date of this Agreement, you agree to select a proposed location for the Center within the Marketing Area, which location is subject to our approval. You agree to submit to us all information we request about the proposed location. In approving or disapproving any proposed location, we will consider such factors as we deem relevant, including general location, neighborhood and distance to any other DirectBuy center. Upon approval of a proposed location, Schedule B will be completed and signed by both parties, and the location identified in Schedule B will be deemed the "Premises".

      If you and we are unable to mutually agree on a location for your Center within 60 days after the date of this Agreement, either party has the right to terminate this Agreement, effective upon notice. We will refund, without interest, the portion of the initial franchise fee you have paid (less costs we have incurred), provided you and your Owners sign a general release satisfactory to us.

      **2.04**   **Our Reservation of Rights.** Except as otherwise expressly provided in this Agreement, we, on behalf of ourselves and our Affiliates, retain all of our rights and discretion with respect to the Marks, the System and DirectBuy centers anywhere in the world, including the right to: (a) market, solicit and sell, and grant other persons the right to market, solicit and sell, memberships for DirectBuy centers to persons residing within the Marketing Area; (b) operate, and grant the right to operate, DirectBuy centers located anywhere outside the Marketing Area; (c) market, solicit and sell memberships for DirectBuy centers to groups in excess of 25 persons within and outside the Marketing Area; (d) license and sell to others within and outside the Marketing Area pursuant to any terms and conditions we deem appropriate any or all of the concepts, formats and systems of a DirectBuy center using trademarks or service marks, other than the Marks; and (e) offer and sell to members of your Center products and services without compensation to you.

      **2.05**   **Disclaimer.** Neither our agreement to permit you to operate in the Marketing Area, nor our approval of the Premises constitutes a warranty or representation of any kind, express or implied, as to the suitability of the Marketing Area or Premises for a DirectBuy center or for any other purpose. Our proposal or acceptance of these matters merely signifies that we are willing to grant a franchise for a DirectBuy center located at that site and operating within that geographical area. Your decision to develop and operate a DirectBuy center is based solely on your own independent investigation and judgment of the suitability of the Premises and the Marketing Area for a DirectBuy center.

**3.**    **FEES.**

      **3.01**   **Initial Franchise Fee.** You agree to pay us an initial franchise fee of $55,000, of which $5,000 is payable when you sign this Agreement, $10,000 is payable when you start the initial training program, and $40,000 is called the "Deferred Amount" and is payable as described

below. The initial franchise fee is non-refundable, except as otherwise provided herein.

The Deferred Amount, as well as interest at the rate set forth below, is payable in increments of $50 for each new membership of your Center that is sold after the sixth (6th) month after your Center opens for business until the entire Deferred Amount and all accrued interest is paid in full. These payments must be made concurrently with payment of royalty fees, except that any remaining balance of the Deferred Amount and all accrued but unpaid interest shall be due on June 2007. Interest accrues from the date of the sale of the first new membership of your Center at an annual rate of eight (8%) percent. If this interest rate is in conflict with any applicable law, then the interest rate shall be the maximum permitted by law. All payments shall be applied first to accrued and unpaid interest and the remainder to the outstanding balance of the Deferred Amount. If you become insolvent or unable to pay your debts as they mature or you breach this Agreement or any other agreement with us or any of our Affiliates, we may declare the outstanding balance of the Deferred Amount, and all accrued and unpaid interest, to be immediately due and payable, without demand or notice, which you hereby waive. You waive presentment for payment, notice of dishonor and protest.

**3.02  Royalty Fees.** You agree to pay us a weekly royalty fee equal to: (a) twenty-two percent (22%) of the gross amount you charge for a new membership (including any renewal option fees) for each new member of your Center (regardless whether such amount is paid in full at the time of sale), and (b) fifty percent (50%) of the gross amount you charge for a renewal membership (regardless whether such amount is paid in full) for each renewal of a membership in your Center. Notwithstanding the foregoing, if the amount you charge for a new membership is less than our then current suggested new membership fee, the royalty fee will be based on the suggested membership fee and not on the fee you actually charge.

The royalty fee for each membership is payable 5 business days after the sale or renewal thereof. If, within such 5 business days, a new member cancels his membership and you refund his membership fee in full, we will not charge a royalty fee on such canceled sale. We have the right to receive membership renewal fees on your behalf and to remit to you on a monthly basis the remainder of membership renewal fees after deduction of royalty fees and any other amounts you owe us or any of our Affiliates.

**3.03  Marketing and Legislative Fund Contributions.** You agree to contribute (at such times as we may designate from time to time) to the Marketing and Legislative Fund $1,000 during each of our fiscal years, except that you are not required to make any contributions during the first 12 months in which you operate your Center. We have the right from time to time to increase the amount you are required to contribute to the Marketing and Legislative Fund, provided we may not increase the amount of your contributions to more than 3% of the gross amounts you charge for new memberships (including renewal option fees, but excluding renewal fees). DirectBuy center businesses owned by us and our Affiliates will contribute to the Marketing and Legislative Fund on the same basis as you are required to do.

**3.04  Method of Payment.** We may require that all royalty fees, Marketing and Legislative Fund contributions, payments for product purchases and any other payments hereunder be effected, at your cost, through electronic debit/credit transfer of funds programs that we specify

from time to time, and you agree to sign such documents (including independent transfer authorizations) and do such things as we deem necessary to facilitate electronic transfer of funds.

     **3.05**   **Interest On Late Payments**. All amounts which you owe us or any of our Affiliates, including Marketing and Legislative Fund contributions, shall bear interest after their due date at the highest contract rate of interest permitted by law, not to exceed 2% per month. However, your failure to pay all amounts when due constitutes grounds for termination of this Agreement, as provided in Section 14.

     **3.06**   **Security Deposit.** You agree to pay us before opening your Center a $10,000 refundable security deposit to secure performance of your obligations under this Agreement. If we determine you have failed to comply with any of your obligations under this Agreement, we have the right to use the security deposit for any reason we deem reasonably appropriate, including the following: (a) to refund or complete merchandise orders; (b) to refund membership fees to members of your Center; and (c) to defray all expenses for 24 months for the operation of a DirectBuy center located in the Center Area, if this Agreement is terminated. If we so use the security deposit, we will not thereby be deemed to have assumed any of your obligations or liabilities to members of your Center. We may from time to time require you to increase the amount of the security deposit as we deem reasonably appropriate, including the circumstances of any default by you.

     At our sole discretion, we may permit you, as an alternative to paying us a security deposit, to obtain an annually renewable irrevocable letter of credit from a national banking institution reasonably acceptable to us in an amount we determine from time to time at our discretion, but not less than $10,000. If we permit you to do so:

     (a)    You agree to periodically provide evidence or confirmation acceptable to us of the existence and effectiveness of the letter of credit and to have the initial letter of credit in effect before we send you the Marketing and Merchandise Ordering Materials pursuant to Section 4.03;

     (b)    We have the right to draw against the letter of credit at any time and without prior notice to you, if we determine you have failed to comply with any of your obligations under this Agreement. We have the right to use funds drawn from the letter of credit in the same manner as set forth above for the security deposit;

     (c)    If at any time you fail to provide us with confirmation of renewal of the letter of credit, we may draw against the letter of credit for the full amount and use the funds as collateral to secure your obligations and to apply the funds as above described. However, any failure to obtain the letter of credit and keep it in effect during the Term in an amount we deem reasonably appropriate constitutes grounds for termination of this Agreement; and

     (d)    The exercise of our right to draw on the letter of credit does not constitute a limitation on, or an assumption by us of, any of your obligations or liabilities to

members of your Center. You waive all demands, notices, timely presentments or requests relating to the letter of credit.

**3.07    Application of Payments**. We may apply any payments by you, or offset any amounts we or any of our Affiliates owe you, to or against any of your past due indebtedness for royalties, Marketing and Legislative Fund contributions or any other indebtedness to us or any of our Affiliates, notwithstanding any contrary designation by you.

## 4.    TRAINING AND ASSISTANCE.

**4.01    Initial Training Program**. Before opening your Center, you (or your Operating Partner) are required to attend an initial training program on the operation of a DirectBuy center, furnished at such place(s) and time(s) as we designate. You will be solely responsible for all compensation, travel, lodging and living expenses incurred in connection with attending the initial training program and all supplemental or refresher training programs, except that we will pay for the reasonable cost of travel, lodging and meals for two (2) persons incurred in connection with attending the initial training program.

**4.02    Supplemental Training Programs**. After opening your Center, we may provide training (subject to reasonable limitations as to frequency and time) to any new sales or showroom manager of your Center and may also provide refresher or supplemental training programs. We may require you (or your Operating Partner) and all your managers to attend such refresher and supplemental training programs. Your failure to attend any refresher or supplemental training program, even if not mandatory, constitutes your acknowledgment that you have received and are receiving all required assistance.

**4.03    Marketing and Merchandise Ordering Materials**. We grant you the right to use our sales videotapes, sales materials, merchandise catalogs, carpet samples, fabric swatches and other materials we develop and use for DirectBuy centers (the "Marketing and Merchandise Ordering Materials"). We will provide updated materials to reflect new authorized merchandise and new sales methods and techniques, all of which are considered part of the Marketing and Merchandise Ordering Materials. We have the right to assess reasonable charges for the new or updated materials. We may, at any time and at our sole discretion, require you to stop selling any merchandise or to stop using any Marketing and Merchandise Ordering Materials and to return all copies and samples to us.

In addition, the Marketing and Merchandise Ordering Materials may include infomercials. We have the right to condition your use of any infomercial on your obtaining our prior written approval and your compliance with all reasonable requirements we may specify from time to time. We may, at any time, revoke such approval for your failure to maintain compliance with our requirements.

You acknowledge and agree that the Marketing and Merchandise Ordering Materials are our sole and exclusive property and that you have no rights to them, other than the right to use them in the operation of your Center in accordance with this Agreement. You agree to use the Marketing and Merchandise Ordering Materials solely in the manner we prescribe. You may not

make any copies of the Marketing and Merchandise Ordering Materials, nor infringe or contest our copyrights or other rights therein.

**4.04    Operating Manual.** We will loan you 1 copy of the Operating Manual. You agree to comply fully with all mandatory standards and operating procedures and other obligations contained in the Operating Manual. We may modify the Operating Manual to reflect changes in authorized products and services, standards and operating procedures, provided no addition or modification may alter your fundamental status and rights under this Agreement. Mandatory standards and operating procedures and other obligations that we prescribe in the Operating Manual, or otherwise communicate to you in writing, constitute provisions of this Agreement as if fully set forth herein. All references to this Agreement include all such mandatory standards and operating procedures and other obligations. You agree to keep your copy of the Operating Manual current. If a dispute develops relating to the contents of the Operating Manual, our master copy will control. The Operating Manual contains Confidential Information, and you agree not to copy any part of the Operating Manual.

**4.05    On-Going Guidance**. We will furnish you periodic guidance with respect to the System, including improvements and changes to the System. Such guidance, at our discretion, may be in the form of the Operating Manual, bulletins or other written materials, telephonic consultations or consultations at our offices or at the Center or by any other means of communication. At your request, we may provide special assistance for which you may be required to pay per diem fees and charges.

## 5.    DEVELOPMENT OF THE CENTER.

**5.01    Lease of Premises of the Center**. You agree to lease or sublease the Premises within 30 days after Schedule B has been completed and signed. Any lease or sublease of the Premises is required to have such provisions as are reasonably acceptable to us and, at our discretion, may be required to be conditionally assigned to us (with the consent of the lessor, if required) by a conditional assignment agreement acceptable to us.

**5.02    Development and Opening of the Center**. You may operate the Center only at Premises. You are responsible for developing the Premises and all expenses associated with it. You agree to do the following: (a) prepare and submit to us for approval, your proposed plans for layout and design of the Premises, which must comply with applicable ordinances, building codes, permit requirements and lease requirements and restrictions; (b) obtain all required permits and licenses, including building, sign, occupancy and business permits; (c) construct all improvements to the Premises in compliance with the plans we approve and in compliance with all applicable ordinances, building codes, permit and license requirements and lease requirements and restrictions; decorate the premises, and purchase or lease and install all fixtures, furniture, equipment (including videotape, telephone and computer equipment) and signs designated by us; and (d) establish recordkeeping and accounting systems conforming to our requirements.

We will furnish you our prototype plans for layout and design of a DirectBuy center for your adaptation to the Premises. Such plans will not contain requirements of any federal, state or local law, code or regulation, including those concerning the Americans with Disabilities Act

("ADA") or similar rules governing public accommodation for persons with disabilities. We will furnish such further guidance in developing the Premises as we deem appropriate. We may periodically inspect the Premises during its development. We do not, by approving your plans or specifications or inspecting the Premises, assume any liability or responsibility to you or to any third parties. We are not responsible, and will have no liability, for compliance with any federal, state or local law, ordinance or regulation (including ADA) with respect to the Premises. We agree to provide you, at no charge, our standard initial operation package, which consists of a standard interior sign and an initial inventory of forms and supplies. This package does not include any display merchandise, which you have to buy yourself.

You agree not to market, solicit or sell memberships for your Center before it has opened for business. You agree not to open your Center for business without our approval. Your Center must be open for business within 120 days after you complete our initial training program; however, we may, at our discretion, grant an extension of time for opening the Center.

## 6.    CENTER OPERATING STANDARDS.

**6.01    Memberships**. You are solely responsible for all obligations and liabilities to members of your Center. We have no obligations or liabilities to those members whatsoever, except as otherwise expressly provided in this Agreement.

The presentation of a uniform image to the public is an essential element of a successful franchise system of buyer clubs. We have the right to determine the terms and conditions (other than prices and terms of payment) of membership agreements for your Center. In order to assure your compliance, you agree to submit to us completed application forms for all members of your Center concurrently with the payment of royalty fees due on such memberships, and we will issue all membership cards or other indicia of membership for your Center on your behalf. We are not obligated to issue membership cards or any other indicia of membership for any member of your Center unless the royalty fee on such membership has been paid in full and the terms of membership (other than price and terms of payment) conform to our requirements. Our issuance of membership cards or other indicia of membership is solely a ministerial act on your behalf, and is not indicative (and you may not represent) that we confer membership rights on any member of your Center.

You may establish reasonable criteria for memberships for your Center, but you may not, directly or indirectly, discriminate against anyone due to their race, color, religion, sex or national origin. You agree to retain complete files, including membership application forms, of all persons who have applied for membership at your Center. We have the right to use information about members of your Center for any purpose without compensation to you. You may use only those types of membership application forms as we approve. You may purchase such forms from any supplier approved by us, which may include us or any of our Affiliates.

Another essential element of a successful franchise system of buyer clubs is the ability of a member of one club to purchase merchandise and other products and services in all clubs belonging to the franchise system. Therefore, you agree that all authorized merchandise ordering services and other products and services you provide to your own members will be provided to members of

other DirectBuy centers who desire to use your Center's services. For purposes of this Agreement, members of other DirectBuy centers shall be deemed members of your Center with respect to their ordering and purchase of merchandise and other authorized products and services of your Center.

**6.02   Authorized Merchandise**. You agree to order for members of your Center the merchandise and other products and services we authorize for DirectBuy centers and to otherwise conduct the business of your Center in accordance with the standards and procedures we prescribe.

You may not, without our approval, order any merchandise, or other products and services, that are not then authorized by us for DirectBuy centers, nor shall your Center or the Premises be used for any purpose other than the operation of a DirectBuy center in compliance with this Agreement. You may order merchandise, and other products and services, only for members of your Center and for members of other DirectBuy centers.

The essence of DirectBuy centers is the ability to obtain merchandise at prevailing prices from manufacturers and suppliers and to pass such savings on to their members. All DirectBuy centers must consolidate their buying power in order to do so. Accordingly, you agree to order all merchandise and other authorized products and services exclusively from or through us in accordance with our procedures, unless we have authorized you to do otherwise. We may modify merchandise ordering procedures, including requiring immediate submission of orders through computer transmissions or facsimile and immediate wire transfers of funds. We agree to order authorized merchandise on your behalf from the appropriate manufacturer or supplier and to sell (or cause the manufacturer or supplier to sell) such merchandise to you at the manufacturer's or supplier's then current published price in accordance with our procedures. We are entitled to keep any rebates or discounts from the manufacturer's or supplier's then current published price, as well as promotional and other benefits from manufacturers and suppliers, without any obligation to pass them on to you. We are entitled to use such freight or shipping companies as we deem appropriate, including any Affiliate, to deliver merchandise to your Center.

You recognize that the concept of a DirectBuy center may change over time. You agree to adopt such changes in your Center as we may direct. We may conduct market research and testing to determine consumer trends and the salability of new products, merchandise and services for DirectBuy centers. You agree to participate in market research and test marketing, to purchase reasonable quantities and make reasonable efforts sell such products or services and to provide us with timely reports and information.

**6.03   Merchandise Funds.** All funds for merchandise orders, freight, handling charges, service charges, sales or retailers' occupation taxes and other associated payments received from members of your Center ("Merchandise Funds") must be deposited by the end of the next business day in a merchandise account, as set forth below.

We may require that some or all of the Merchandise Funds be deposited directly into one or more accounts that are owned and controlled by us ("Franchisor's Merchandise Account") at one or more banks and/or other financial institutions that we select. If we require such direct deposit into Franchisor's Merchandise Account, we will handle all disbursements from such account (including disbursements of funds to one or more of our Affiliates for further handling in consolidating,

purchasing and shipping merchandise) in accordance with procedures we may establish from time to time.

We may also require that some or all of the Merchandise Funds be deposited into one or more accounts that are owned and controlled by you ("Franchisee's Merchandise Account") at one or more banks and/or financial institutions reasonably acceptable to us. Any such Franchisee's Merchandise Account shall be completely unencumbered (with a waiver by the banks and/or financial institutions of any right to off-set or otherwise draw against the accounts for any reason whatsoever, including as a result of any unpaid indebtedness by you to such bank or financial institution) and separate and apart from your general operating accounts. We may require you to cause such banks and/or other financial institution(s) to automatically transfer funds from the Franchisee's Merchandise Account to us for further handling. Funds in Franchisee's Merchandise Account may be expended, disbursed or used only in accordance with our procedures.

You agree that Franchisee's Merchandise Account at all times will have a balance which is at least equal to the greater of $5,000 or the total amount of Merchandise Funds received from members of your Center to whom merchandise has not been delivered, less amounts forwarded to us and amounts paid directly to suppliers and manufacturers for which we have authorized direct payments. The balance of Franchisee's Merchandise Account must at all times be sufficient to pay sales taxes or retailers' occupation taxes, freight and other associated charges.

We will process all payments to manufacturers and suppliers on your behalf, except that we, at our discretion, may permit you to handle payments to local suppliers. We may process directly or return to you funds to process freight, handling charges, sales or retailers' occupation taxes and other associated payments. We will provide you periodic reports on Merchandise Funds we are handling. We may charge reasonable administrative fees as compensation for our services. We and our Affiliates also may invest such funds and keep any interest or other financial return earned on funds transferred to us. We do not act as trustee or in any other fiduciary capacity to you, to members of your Center or to anyone else with respect to merchandise funds you transfer to us.

**6.04   Financial Responsibility Requirements.** You agree to maintain an unencumbered balance of at least $5,000 in an operating account established at a financial institution reasonably acceptable to us. You also agree to maintain cash, bank account balances and accounts receivable balances equal to or greater than your liabilities arising from your Center, including any debts or loans relating to the ownership or operation of your Center, but excluding any liability for deferred initial franchise fees.

**6.05   Appearance of the Center.** You may use in the development and operation of your Center only those brands or types of fixtures, equipment, furniture, signs and other materials and supplies we approve for DirectBuy centers. You may purchase or lease approved brands and types of fixtures, equipment, furniture, signs and other materials and supplies from any supplier, which may include us or any of our Affiliates.

You agree to keep the Premises clean, attractive and consistent with the image of a DirectBuy center. You agree to effect all maintenance of the Premises as we require, including

10/03
3692043.6/Franchise Agreement 10/30/03

11

interior and exterior repair and cleaning; replacement of worn out or obsolete leasehold improvements, fixtures, furniture, equipment, signs and display merchandise; and periodic redecorating. You may not make any material alterations to the Premises, nor make any material alterations to the layout, leasehold improvements, fixtures, signs, equipment or appearance of the Premises, without our approval.

  **6.06**  **Standards And Procedures**. You acknowledge that every aspect of the appearance and operation of your Center is important to us and is subject to our standards and procedures. You agree to comply with all mandatory standards and procedures including: (a) hours and days of operation; (b) cleanliness and appearance of your Center; (c) general appearance and demeanor of employees of your Center; (d) membership marketing, solicitation and sale methods; (e) merchandise ordering and handling procedures; and (f) catalogs, materials and supplies used in the operation of your Center.

  **6.07**  **Compliance With Laws.** You agree to maintain in force in your name all required licenses, permits and certificates relating to the operation of your Center. You agree to operate your Center in full compliance with all applicable laws, ordinances and regulations, including any applicable laws, ordinances and regulations relating to buyer clubs, future service contracts, telephone solicitation and consumer financing, and agree that you have sole responsibility for being and staying apprised of such laws, ordinances and regulations and all changes thereto. You agree to notify us in writing within 5 days after: (a) the commencement of any legal or administrative action, or the issuance of any order of any court, agency or other governmental instrumentality, which may adversely affect the operation of your Center or your financial condition; or (b) the delivery of any notice of violation or alleged violation of any law, ordinance or regulation.

  You agree that all of your advertising, solicitation and promotion (including membership solicitation) will be completely factual and will conform to the highest standards of ethical advertising. You agree to adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct in all dealings with your members, employees, suppliers, lessors and the public. You agree to refrain from any business or advertising practice which may be injurious to our business, to any other DirectBuy center or to the goodwill associated with the Marks.

  You agree to send us immediately any letters of appreciation, complaint or criticism of your Center and, with respect to complaints and criticisms, to furnish us with your response and describe in writing all action taken or proposed to be taken to rectify any complaints.

  **6.08**  **Personnel**. Your Center is required at all times to be staffed by a sufficient number of competent and properly trained employees. You are responsible for hiring all employees of your Center and are responsible exclusively for the terms of their employment, including compensation, and for their proper hiring. You are solely responsible for all employment decisions of your Center, including those related to hiring, firing, remuneration, personnel policies, benefits, record keeping, supervision, and discipline, and regardless of whether you received advice from us on these subjects. You agree to establish at your Center an employee training program meeting our standards. You may not recruit or hire any person who is an employee of ours or of any DirectBuy center operated by us, our Affiliates or another franchisee of ours without obtaining the consent of that person's employer, which consent may be withheld for any reason.

**6.09** **Insurance.** You agree to maintain in force: (a) commercial general and product liability insurance; (b) general casualty insurance, including fire and extended coverage, vandalism and malicious mischief insurance, for the replacement value of your Center and its contents; and (c) such other insurance policies, such as business interruption, automobile and unemployment insurance, as we may determine from time to time. All insurance policies shall be issued by carriers approved by us, shall contain such types and minimum amounts of coverage, exclusions and maximum deductibles as we prescribe, shall name us and our Affiliates as additional insureds, shall provide for 30 days' prior written notice to us of any material modification, cancellation or expiration of such policy and shall include such other provisions as we require.

At our request, you agree to furnish us with evidence of insurance coverage and payment of premiums. If you fail to maintain any required insurance coverage, or to furnish satisfactory evidence thereof, we may obtain such insurance coverage on your behalf, in addition to our other rights and remedies hereunder. If we do so, you agree to fully cooperate with us in our effort to obtain such insurance policies and pay for any costs and premiums we incur. Your obligation to maintain insurance coverage is not diminished in any manner by reason of any separate insurance we maintain, nor does it relieve you of your obligations under Section 17.02.

**6.10** **Member Prices.** We may offer guidance to you relating to prices for new and renewal membership fees, products and services of your Center that in our judgment constitute good business practice. No such guidance shall be deemed to impose on you any obligation to charge any fixed or minimum price. You will have the sole right to determine the prices to be charged by your Center. Notwithstanding the foregoing, you agree that annual renewal membership fees shall be 10% of the new membership fee you charge, and that your Actual Service Charges will not exceed eight percent (8%) of your actual cost of purchasing merchandise for members of your Center, provided we may require you to reduce your Actual Service Charges by two percent (2%) for merchandise paid by cash or check. You will not enter into any agreement or arrangement or engage in any concerted practice with other DirectBuy centers or other competitors relating to the prices at which memberships, products or services will be sold by you or by other DirectBuy centers.

**6.11** **Credit Card Sales.** You agree to accept from members of your Center such credit cards and charge cards, as we from time to time may designate. You agree to execute and comply with all applicable credit card agreements. We have the right to process credit card transactions with the appropriate credit card servicing center and to charge you reasonable fees for such services.

**6.12** **Websites/Internet Sales.** You agree not to offer or sell any memberships for your Center, nor provide ordering services for any products or services in connection with your Center, through the Internet without our consent. In connection with any such consent, we may establish such requirements as we deem appropriate, including (a) obtaining our prior written approval of any Internet domain name and home page addresses; (b) submission for our approval of all Web site pages, advertising, materials and content; (c) use of all hyperlinks and other links; (d) restrictions on use of any materials (including text, video clips, photographs, images and sound bites) in which any third party has any ownership interest; (e) obtaining our prior written

approval of any modifications; and (f) consenting in advance to our removal of any Web site pages, materials, advertising and content as we deem desirable, in our sole discretion, to maintain and enhance the goodwill associated with the Marks.

We may, at our discretion, offer and sell DirectBuy memberships within and outside the Marketing Area, and provide ordering services for products and services (on your behalf or otherwise) to members of your Center, through the Internet on such terms and conditions as we deem appropriate. In connection therewith, you agree to abide by such reasonable requirements and restrictions as we may impose from time to time. We may require you to participate in any such endeavors, including participation with pages on any of our Web sites, and to execute such agreements as we deem reasonably appropriate in connection therewith. For any orders submitted directly to us by your members, including orders submitted through the Internet, we may charge members such processing and handling fees as we deem appropriate and we agree to remit to you reasonable handling fees for orders shipped to your Center for pick-up.

7.    **MARKETING AND ADVERTISING**.

7.01    **Marketing and Legislative Fund**. We may, in our sole discretion, establish and administer a fund ("the Marketing and Legislative Fund") for the creation and development of marketing, advertising, and related programs and/or legislative, legal and regulatory defense programs relating to buyer clubs and other laws and regulations that affect DirectBuy centers (and any buyer clubs in operation by us, our Affiliates, or any licensee of us under the name "UCC Total Home"). We will have sole discretion over all aspects of programs financed by the Marketing and Legislative Fund, including creative concepts, media, materials and endorsements of marketing and advertising programs and selection of legislative watch services, lobbyists and attorneys for legislative, legal and regulatory matters. Although any marketing and advertising programs funded by the Marketing and Legislative Fund are intended to maximize general recognition and patronage of the Marks for the benefit of all DirectBuy centers (and any buyer clubs operating under the "UCC Total Home" name), we cannot assure you that any particular DirectBuy center will benefit directly or pro-rata from the placement of advertising. The Marketing and Legislative Fund may be used to pay for the cost of preparing and producing marketing and advertising materials and programs we select, including Internet media (such as Web sites), video, audio and written advertising materials, and for the cost of employing advertising agencies, market research activities, legislative watch services, lobbyists, attorneys, and settlement costs. We may furnish you with marketing, advertising and promotional materials at cost, plus any related administrative, shipping, handling and storage charges.

The Marketing and Legislative Fund will be accounted for separately from our other funds and will not be used to defray any of our general operating expenses, except for reasonable salaries, administrative costs and overhead we may incur in activities related to the administration of the Marketing and Legislative Fund and its programs, including collecting and accounting for contributions to the Marketing and Legislative Fund. All disbursements from the Marketing and Legislative Fund shall be made first from income and then from contributions. We may spend in any fiscal year an amount which is more or less than the aggregate contributions to the Marketing and Legislative Fund in that year, and the Marketing and Legislative Fund may borrow from us or other lenders to cover deficits or cause the Marketing and Legislative Fund to invest any surplus for

future use. We will prepare annually a statement of monies collected and costs incurred by the Marketing and Legislative Fund and furnish you a copy on your written request. Except as otherwise expressly provided in this Section, we assume no liability or obligation with respect to the establishment, direction or administration of the Marketing and Legislative Fund. We do not act as trustee or in any other fiduciary capacity with respect to the Marketing and Legislative Fund.

     7.02   **Your Advertising**. You agree to submit to us for our prior approval, samples of all marketing, solicitation, advertising and promotional materials not prepared or previously approved by us and which vary from our standard materials. You may not use any materials we have disapproved.

## 8.   RECORDS AND REPORTS.

     8.01   **Records.** You agree to prepare and to maintain for at least 3 years complete and accurate books, records (including membership and merchandise sales records) and accounts (using our standard chart of accounts) for your Center, copies of your signed sales tax returns and such portions of your signed state and federal income tax returns as relate to your Center. All such books and records shall be kept at the Premises, unless we otherwise approve.

     We may require you to purchase or lease at your expense such computer hardware and software, required dedicated telephone and power lines, modems, printers, and other computer-related accessories or peripheral equipment as we may specify from time to time, for the purpose of, among other functions, membership, merchandise and accounting functions. If we require you to use our proprietary software, you agree to execute and comply with such software license agreements as we deem necessary to protect our interests, and you agree to pay such license and maintenance fees as we deem reasonably appropriate.

     You agree to provide such assistance as may be required to connect your computer system with our computer system. We have the right from time to time and at any time to retrieve such data and information from your computer system as we, in our sole discretion, deem necessary or desirable, with the cost of such telephonic retrieval to be borne by you. In view of the contemplated interconnection of computer systems and the necessity that such systems be compatible with each other, you agree to strictly comply with our standards and specifications for all items associated with your computer systems.

     To ensure full operational efficiency and optimum communication capability between and among computer systems, you agree at your expense, to keep your computer systems in good condition, and to promptly install such additions, changes, modifications, substitutions or replacements to hardware, software, telephone and power lines, and other computer-related facilities, as we direct.

     8.02   **Periodic Reports.** You agree to furnish us: (a) at the same time the royalty fee is due, statements relating to amounts charged for membership fees; (b) within ten (10) days after the end of each month, statements on your Actual Service Charges; (c) within sixty (60) days after the end of each of your fiscal quarters, a quarterly and year-to-date profit and loss statement, balance sheet and cash flow statement with respect to your Center for the preceding fiscal quarter; (d)

within one hundred and twenty (120) days after the end of each of your fiscal years, an annual profit and loss statement and cash flow statement and a balance sheet with respect to your Center as of your fiscal year end; and (d) such other information as we may require, including sales and income tax statements. You agree to verify that the information in each such report and financial statement is complete and accurate and you agree to sign it. We have the right to disclose data from such reports and statements if we consider disclosure reasonably appropriate. We reserve the right to require that your annual financial statements be audited, at your expense, by an independent certified public accountant we approve.

## 9.    INSPECTIONS AND AUDITS OF YOUR CENTER.

**9.01    Inspections.** We and our agents have the right at any reasonable time and without prior notice to: (a) inspect your Center; (b) observe, photograph, audio-tape and/or video tape the operations of your Center; and (c) interview personnel and members of your Center. You agree to cooperate fully with such activities.

**9.02    Audits.** We have the right at any time during business hours, and without prior notice, to inspect, copy and audit the books, records, tax returns and documents relating to the development, ownership, lease, occupancy or operation of your Center. You agree to cooperate fully with our representatives and independent accountants conducting such audits. If any inspection or audit discloses an underpayment of any royalty fees, service fees, Marketing and Legislative Fund contributions or merchandise orders, you agree to pay us, within seven (7) days after receipt of the inspection or audit report, the royalty fees, service fees, Marketing and Legislative Fund contributions and/or merchandise orders due and owing, plus interest (as provided in Section 3.05) from the date originally due until the date of payment. Further, if such inspection or audit is made necessary by your failure to furnish reports, records or information on a timely basis, or if we determine any underpayment for the period of any audit to be greater than 2% of the amount due for such period, you agree to reimburse us for the cost of such audit or inspection, including the charges of any attorneys and independent accountants and the travel expenses, room and board and compensation of our employees.

## 10.    TRADEMARKS.

**10.01    Ownership of the Marks.** You acknowledge that United Consumer Club, Inc. ("Parent Company") owns the Marks. Your right to use the Marks is derived solely from this Agreement and is limited to conducting business pursuant to and in compliance with this Agreement. Your unauthorized use of any of the Marks constitutes a breach of this Agreement and an infringement of our Parent Company's rights to the Marks. This agreement does not confer on you any goodwill or other interests in the Marks. Your use of the Marks and any goodwill established thereby inures to the exclusive benefit of our Parent Company. All provisions of this Agreement applicable to the Marks apply to any additional or substitute trademarks, service marks and trade dress we authorize you to use. You may not at any time during or after the Term contest, or assist any other person in contesting, the validity or ownership of any of the Marks.

**10.02    Use of the Marks.** You agree to use the Marks as the sole identification of your Center, provided you identify yourself as the independent owner thereof in the manner we

prescribe. You agree to use the Marks as we prescribe in connection with the sale of authorized products and services. We may authorize you to add a geographic designation to one or more of the Marks to identify the location of your Center, but you agree not to assert any rights whatsoever to the geographic designation, whether in combination with any of the Marks or alone. You may not use any Mark (or any abbreviation, modification or colorable imitation) as part of any corporate or legal business name or in any other manner (including as an electronic media identifier, such as websites, web pages or domain names) not expressly authorized by us in writing.

10.03   Discontinuance of Use of Marks.  If it becomes advisable at any time for us and/or you to modify or discontinue use of any Mark and/or use one or more additional or substitute trademarks, service marks or trade dress, you agree to comply with our directions within a reasonable time after notice. We will have no liability or obligation whatsoever with respect to any such required modification or discontinuance or the promotion of a substitute trademark, service mark or trade dress.

10.04   Notification of Infringements and Claims.  You agree to notify us immediately of any apparent infringement of, or challenge to, your use of any Mark or any claim by another person of any rights in any Mark. You may not communicate with any person, other than your legal counsel, us, our Parent Company and their legal counsel, in connection with any such infringement, challenge or claim. Our Parent Company will have sole discretion to take such action as it deems appropriate and will have the right to control exclusively any litigation or U.S. Patent and Trademark Office proceeding arising out of any such infringement, challenge or claim or otherwise relating to any Mark. You agree to sign any and all documents, render such assistance and do such things as may be advisable in the opinion of our Parent Company's legal counsel to protect its interests in any litigation or U.S. Patent and Trademark Office proceeding or otherwise to protect its interests in the Marks.

10.05   Indemnification of Franchisee.  We agree to indemnify you against, and to reimburse you for, all damages for which you are held liable in any proceeding arising out of your authorized use of any Mark pursuant to and in compliance with this Agreement and, except as provided herein, for all costs you reasonably incur in defending any such claim brought against you, provided you have timely notified us of such claim and provided further that you and your Owners and Affiliates are in compliance with this Agreement and all other agreements entered into with us or any of our Affiliates. We, at our sole discretion, are entitled to prosecute, defend and/or settle any proceeding arising out of your use of any Mark pursuant to this Agreement, and, if we undertake to prosecute, defend and/or settle any such matter, we have no obligation to indemnify or reimburse you for any fees or disbursements of any legal counsel retained by you.

## 11.   RESTRICTIVE COVENANTS.

11.01   Confidential Information.  We will disclose parts of our Confidential Information to you solely for your use in the operation of your Center. The Confidential Information is proprietary and includes trade secrets. During the Term and thereafter: (a) you may not use the Confidential Information in any other business or capacity (you acknowledge such use is an unfair method of competition); (b) you agree to exert your best efforts to maintain the confidentiality of the Confidential Information; (c) you may not make unauthorized copies of any portion of the

**EXHIBIT B**

Confidential Information disclosed in written, electronic or other form; and (d) you agree to implement all reasonable procedures we prescribe to prevent unauthorized use or disclosure of the Confidential Information, including the use of nondisclosure agreements with your officers, directors, managers and other personnel and the delivery of such agreements to us.

Your restrictions on disclosure and use of Confidential Information do not apply to information or techniques which are or become generally known in the buyer club industry (other than through your own disclosure), provided you obtain our prior written consent to such disclosure or use.

**11.02  In-Term Covenants**.  During the Term, neither you nor any of your Owners may, without our prior consent: (a) directly or indirectly (such as through members of his or their Immediate Families) own any legal or beneficial interest in, or render services or give advice to: (1) any Competitive Business located anywhere; or (2) any entity located anywhere which grants franchises, licenses or other interests to others to operate any Competitive Business; or (b) divert or attempt to divert any business of DirectBuy centers to any competitor or do anything injurious or prejudicial to the goodwill associated with the Marks or the System.

**11.03  Information Exchange**.  All ideas, concepts, methods, techniques useful to a buyer club business, whether or not constituting protectable intellectual property, that you create, or that are created on your behalf, shall be promptly disclosed to us.  If we adopt any of them as part of the System, they will be deemed to be our sole and exclusive property and deemed to be works made-for-hire for us.  You agree to sign whatever assignment or other documents we request to evidence our ownership or to assist us in securing intellectual property rights in such ideas, concepts, techniques or materials.

**11.04  Post-Term Covenants**.  If: (a) this Agreement is terminated prior to its expiration; or (b) this Agreement expires and is not renewed in accordance with the provisions of Section 15, and we exercise our option to purchase the Remaining Memberships pursuant to Section 16.05; then for a period of 2 years, starting on the effective date of termination or expiration (without renewal) of this Agreement, neither you nor any of your Owners may directly or indirectly (such as through his or their Immediate Families) own a legal or beneficial interest in, or render services or give advice to, any Competitive Business located or operating in the Marketing Area.

You and each of your Owners expressly acknowledge the possession of skills and abilities of a general nature and the opportunity for exploiting those skills in other ways, so that enforcement of the covenants made in this Section will not deprive any of you of your personal goodwill or ability to earn a living.  If you or any of your Owners fail or refuse to abide by any of the foregoing covenants, and we obtain enforcement in a judicial or arbitration proceeding, the obligations under the breached covenant will continue in effect for a period of time ending 2 years after the date such person commences compliance with the order enforcing the covenant.

## 12.  YOUR ORGANIZATION AND MANAGEMENT.

**12.01  Organizational Documents**.  If at any time you are a business corporation, partnership, limited liability company or other legal entity, you and each of your Owners represent,

warrant and agree that: (a) you are duly organized and validly existing under the laws of the state of your organization, and, if a foreign business corporation, partnership, limited liability company or other legal entity, you are duly qualified to transact business in the state in which your Center is located; (b) you have the authority to execute and deliver this Agreement and to perform your obligations hereunder; (c) true and complete copies of the articles or certificate of incorporation, partnership agreement, bylaws, subscription agreements, buy-sell agreements, voting trust agreements and all other documents relating to your ownership, organization, capitalization, management and control have been delivered to us and all amendments thereto shall be promptly delivered to us; (d) your activities and investments are restricted to those necessary solely for the development, ownership and operation of Direct Buy centers in accordance with this Agreement and in accordance with any other agreements entered into with us or any of our Affiliates; (e) the articles or certificate of incorporation, partnership agreement or other organizational documents recite that the issuance, transfer or pledge of any direct or indirect legal or beneficial ownership interest is restricted by the terms of this Agreement; (f) all certificates representing direct or indirect legal or beneficial ownership interests now or hereafter issued must bear a legend in conformity with applicable law reciting or referring to such restrictions; and (g) you will deliver to us a Secretary/Clerk's Certificate or other evidence satisfactory to us, that the execution, delivery and performance of this Agreement and all other agreements and ancillary documents contemplated hereby or thereby have been duly authorized by all necessary action by your corporation, partnership, limited liability company or other legal entity, as applicable.

      **12.02   Disclosure of Ownership Interests**. You and each of your Owners represents, warrants and agrees that Schedule C is current, complete and accurate. You agree that updated Schedules C will be furnished promptly to us, so that Schedule C (as so revised and signed by you) is at all times current, complete and accurate. Each person who is or becomes an Owner shall execute an agreement in form as we prescribe, undertaking to be bound jointly and severally by the terms of this Agreement. Each Owner shall be an individual acting in his individual capacity, unless we waive this requirement.

      **12.03   Operating Partner/Management of Center**. If at any time you are a business corporation, partnership, limited liability company or other legal entity, you agree to designate in Schedule C as the "Operating Partner" an individual approved by us who owns and controls not less than 50% of your equity and voting rights, and who has completed our initial training program to our satisfaction. You (or your Operating Partner) at all times are required to actively supervise and manage the operations of your Center, unless we waive this requirement. If the relationship with your Operating Partner terminates, you agree to promptly hire a successor Operating Partner. Any successor Operating Partner is required to meet our approval and successfully complete our training program.

## 13.   TRANSFER OF AGREEMENT.

      **13.01   Transfer By Franchisee Subject To Approval**. The rights and duties created by this Agreement are personal to you or, if you are a business corporation, partnership, limited liability company or other legal entity, your Owners. Accordingly, neither you nor any of your Owners may transfer the Franchise without our approval and without complying with all of the

provisions of Section 13. Any transfer without such approval or compliance constitutes a breach of this Agreement and is void and of no force or effect.

Our approval of a transfer of the Franchise does not constitute: (a) a representation as to the fairness of the terms of any agreement or arrangement between you or your Owners and the transferee or as to the prospects of success of your Center by the transferee; or (b) a release of you and your Owners, a waiver of any claims against you or your Owners or a waiver of our right to demand the transferee's exact compliance with this Agreement. Any approval shall apply only to the specific transfer of the Franchise being proposed and shall not constitute an approval of, nor shall be deemed to have any effect on, any other transfer of the Franchise.

**13.02   Conditions for Approval**. If we have not exercised our right of first refusal under Section 13.05, we will not unreasonably withhold our approval of a transfer of the Franchise that meets all of the reasonable restrictions, requirements and conditions we impose on the transfer, the transferor(s) and/or the transferee(s), including the following:

(a)   you and your Owners and Affiliates shall be in compliance with the provisions of this Agreement and all other agreements with us or any of our Affiliates;

(b)   the proposed transferee, or its Owners (if the proposed transferee is a legal entity), shall provide us on a timely basis all information we request, shall be individuals acting in their individual capacities who are of good character and reputation, who have sufficient business experience, aptitude and financial resources to operate your Center, and who otherwise meet our approval;

(c)   the transferee (or its operating partner) shall agree to complete our initial training program to our satisfaction and to upgrade the Premises to conform to our then current image and requirements for a DirectBuy center;

(d)   the transferee (and its owners) shall agree to be bound by all of the provisions of this Agreement for the remainder of its term or, at our option, execute our then current standard form of franchise agreement and related documents used in the state in which your Center is located (which shall provide for the same royalty fees and Marketing and Legislative Fund contributions required hereunder and a term equal to the remaining Term), provided, however, if the assignment is pursuant to Section 15.04, the transferee (and its Owners) shall sign the form of franchise agreement and ancillary agreements we then customarily use (which may contain terms and conditions, including royalty fees, substantially differ from those set forth herein) and which shall be for a term equal to the then-customary initial term;

(e)   You or the transferee shall pay us: (1) our then current standard assignment fee to defray our expenses incurred in connection with the assignment, including training of the assignee(s), legal and accounting fees, credit and other investigation costs and evaluation of the assignee(s) and the terms of the assignment; or (2) if the assignment is pursuant to Section 15.04 an amount equal to the initial franchise fee we then customarily require of new franchisees for DirectBuy centers;

(f)     you and your Owners and Affiliates shall, except to the extent limited or prohibited by applicable law, execute a general release, in form and substance satisfactory to us, of any and all claims against us and our Affiliates, stockholders, officers, directors, employees, agents, successors and assigns;

(g)     we may require that the terms of the proposed transfer of the Franchise do not place an unreasonable financial or operational burden on the transferee;

(h)     any financing you (or any of your Owners or Affiliates) offer the transferee shall be subordinate to any current or future obligations of the transferee to us and our Affiliates;

(i)     you and your Owners shall execute a noncompetition covenant, in form and substance satisfactory to us, in favor of us and the transferee agreeing, for a period of 2 years, starting on the effective date of the transfer, that you and your Owners will not directly or indirectly (such as through members of his or their Immediate Families) own any legal or beneficial interest in, or render services or give advice to, any Competitive Business that is located or operating in the Marketing Area; and

(j)     you and your Owners and Affiliates shall execute such other documents and do such other things as we may reasonably require to protect our rights under this Agreement.

**13.03   Special Transfers.** Section 13.05 shall not apply to any transfer of the Franchise among any of your then current Owners nor to any transfer of the Franchise to any member of your Immediate Family or the Immediate Family of a then current Owner of Franchisee (if a business corporation, partnership, limited liability company or other entity). On 30 days' notice to us, you (if you are an individual or partnership) may transfer this Agreement, in conjunction with a transfer of all of the assets of your Center, by an agreement in form and substance approved by us, to a corporation or limited liability company which conducts no business other than your Center, and of which you own and control all of the equity and voting power of all issued and outstanding capital stock. None of the foregoing assignments shall relieve you or your Owners of your respective obligations hereunder, and you and your Owners remain jointly and severally liable for all obligations hereunder.

**13.04   Death or Disability of Franchisee.** Upon your death or permanent disability, or the death or permanent disability of the Operating Partner or an Owner of a controlling interest in Franchisee, the executor, administrator or other personal representative of such person shall transfer his interest in this Agreement or his interest in Franchisee to a third party approved by us in accordance with all of the applicable provisions of Section 13 within a reasonable period of time, not to exceed 9 months from the date of death or permanent disability.

**13.05   Franchisor's Right of First Refusal.** If you or any of your Owners desire to transfer the Franchise for legal consideration, you or such Owner shall obtain a bona fide, executed written offer and earnest money deposit in the amount of at least 5% of the offering price from a responsible and fully disclosed purchaser and shall deliver immediately to us a complete and accurate copy of such offer.

We have the option, exercisable by notice delivered to you or your Owners within 30 days from the date of delivery of a complete and accurate copy of such offer to us, to purchase such interest for the price and on the terms and conditions contained in such offer, provided that: (a) we may substitute cash for any form of payment proposed in such offer; and (b) we will have not less than 90 days from the option exercise date to consummate the transaction.

If we exercise our option to purchase, we are entitled to purchase such interest subject to all representations and warranties, closing documents and indemnities as we reasonably may require. If we do not exercise our option to purchase, you or your Owners may complete the sale to such offeror pursuant to and on the exact terms of such offer, subject to our approval of the transfer as provided in Sections 13.01 and 13.02, provided that if the sale to such offeror is not completed within 90 days after delivery of such offer to us, or if there is a material change in the terms of the offer, you shall promptly notify us and we will have an additional option to purchase (on the terms of the revised offer, if any, and otherwise as set forth herein) during the 30 day period following your notification of the expiration of the 90 day period or the material change to the terms of the offer.

**13.06   Franchisee Bankruptcy**. If this Agreement remains in effect during any proceeding with respect to Franchisee under the United States Bankruptcy Code, and this Agreement is assumed by or assigned to any person or entity who has made a *bona fide* offer to accept an assignment of this Agreement pursuant to the United States Bankruptcy Code, then notice of such proposed assignment or assumption, setting forth (a) the name and address of the proposed assignee, and (b) all of the terms and conditions of the proposed assignment and assumption, shall be given to us within 20 days after receipt of such proposed assignee's offer to accept the assignment of this Agreement, and, in any event, within 10 days prior to the date that the application is made to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption, and we shall thereupon have the prior right and option, to be exercised by notice given at any time prior to the effective date of such proposed assignment and assumption, to accept an assignment of this Agreement upon the same terms and conditions and for the same consideration, if any, as in the *bona fide* offer made by the proposed assignee, less any brokerage commissions which may be payable out of the consideration to be paid by such assignee for the assignment of this Agreement.

**13.07   Transfer by Franchisor**. We have the right to transfer or assign all or any part of our rights or obligations under this Agreement to any person or legal entity. If the assignee shall expressly assume and agree to perform all of our obligations under this Agreement accruing after the date of assignment, then the assignee shall become solely responsible for such obligations. In addition, and without limiting the foregoing, we may sell our assets; may sell our securities in a public offering or in a private placement; may merge with or acquire other corporations, or be acquired by another corporation; and may undertake any refinancing, recapitalization, leveraged buy-out, or other economic or financial restructuring.

## 14.   TERMINATION OF AGREEMENT.

**14.01   Termination Upon Completion of Training**. If, within 3 days after completion of our initial training program described in Section 4.01, you in good faith determine that you do not

desire to own and operate a buyer club business, you have the right to terminate this Agreement, effective upon delivery of notice to us. We will refund, without interest, the portion of the initial franchise fee you have paid (less all costs we have incurred, such as your travel, lodging and meals), provided you and your Owners sign a general release satisfactory to us.

      14.02    **Immediate Termination**. You are in material breach of this Agreement, and this Agreement will automatically terminate without notice, at our discretion, if you become insolvent by reason of your inability to pay your debts as they mature; if you are adjudicated bankrupt or insolvent; if you file a petition in bankruptcy, reorganization or similar proceedings under the bankruptcy laws of the United States or have such a petition filed against you which is not discharged within 30 days; if a receiver or other permanent or temporary, custodian, is appointed for your business, assets, property; if you request the appointment of a receiver or make a general assignment for the benefit of creditors; if final judgment against you in the amount of $25,000 or more remains unsatisfied of record for 30 days or longer; if your bank accounts, property or accounts receivable are attached; if execution is levied against your business or property; if suit is filed to foreclose any lien or mortgage against any of your assets and such suit is not dismissed within 30 days; if you voluntarily dissolve or liquidate or have a petition filed for corporate or partnership dissolution and such petition is not dismissed within 30 days; or if your assets, property or interests are 'blocked' under any law, ordinance or regulation relating to terrorist activities or if you are otherwise in violation of any such law, ordinance or regulation.

      14.03    **Termination Upon Notice.** In addition to our right to terminate pursuant to other provisions of this Agreement and under applicable law, we have the right to terminate this Agreement, effective upon delivery of notice of termination to you, if you or any of your Owners or Affiliates:

           (a) fail to open your Center and start business, as provided in Section 5.02;

           (b) fail to satisfactorily complete our training program, as provided in Section 4.01;

           (c) abandon or fail to actively operate your Center for 3 consecutive days;

           (d) surrender or transfer control of the operation of your Center without our prior consent;

           (e) make any material misstatement or omission in an application for this franchise or in any other information provided to us;

           (f) suffer cancellation or termination of the lease or sublease for your Center;

           (g) are convicted of, or plead no contest to, a felony or other crime or offense that we reasonably believe may adversely affect the goodwill associated with the Marks;

           (h) make an unauthorized transfer of the Franchise or fail to transfer the Franchise or the interest of a deceased or disabled controlling Owner of Franchisee as provided in Section 13.04;

(i)  make any unauthorized use or disclosure of any Confidential Information or use, duplicate or disclose any portion of the Operating Manual in violation of this Agreement;

(j)  commit fraud, violate any applicable buyer club law or regulation, or engage in embezzlement, fraudulent conversion, misappropriation of property or similar conduct, with respect to members or prospective members of your Center, including any misuse of Merchandise Funds;

(k)  fail to timely pay the initial franchise fee, royalty fees, Marketing and Legislative Fund contributions, amounts due for purchases from us or our affiliates or other payments due to us, or fail to timely submit to us merchandise orders or membership applications, and do not correct such failure within 10 days after written notice of such failure is delivered to you;

(l)  fail to comply with any other provision of this Agreement and do not correct such failure within 30 days after notice of such failure to comply is delivered to you;

(m)  fail on 3 or more separate occasions within any period of 12 consecutive months to fail to comply with any provision of this Agreement, whether or not such failure is corrected after notice is delivered to you; or

(n)  fail to obtain a monthly average of 20 new memberships in the Center within any three consecutive calendar month period, starting after the second anniversary of the opening date of the Center.

## 15.   RENEWAL RIGHTS.

15.01  **Your Right To Buy a Successor Franchise.** You have the right, subject to the conditions contained in Section 15, to buy a successor franchise for your Center on the terms and conditions of our then current form of franchise agreement, if upon expiration of the Term:

(a) you and your Owners and Affiliates are in compliance with this Agreement and any other agreements with us or any of our Affiliates, and you and your Owners have been in substantial compliance with this Agreement throughout the Term; and

(b) you maintain the right to possession of the Premises for the term of the successor franchise agreement and enter into an agreement with us whereby you agree to remodel your Center, add or replace improvements, fixtures, furnishings, equipment and signs and otherwise modify your Center to upgrade it to the specifications and standards then applicable for new DirectBuy centers (or if you are unable to maintain possession of the Premises, or in our judgment your Center should be relocated, and you secure substitute premises located within the Marketing Area approved by us and agree to develop the substitute premises in compliance with specifications and standards then applicable for DirectBuy centers).

24

You will be obligated to pay a renewal fee of 50% of our then current standard initial franchise fee.

**15.02   Notices.**  You agree to give us written notice of your desire to buy a successor franchise at least 360 days prior to the expiration of this Agreement.  We will give you notice, not later than 60 days after receipt of your notice, of our decision whether or not you have the right to buy a successor franchise pursuant to Section 15.01.  Notwithstanding any notice of our decision that you have the right to buy a successor franchise, your right will be subject to your continued compliance with all the provisions of this Agreement up to the date of its expiration.

**15.03   Agreements.**  If you have the right to buy a successor franchise in accordance with Section 15.01 and state your desire to exercise that right in accordance with Section 15.02, we and you (and your Owners) will execute the form of franchise agreement (which may contain provisions, including royalty fees, materially different from those contained herein) and all ancillary agreements (including personal guarantees by your Owners and a remodeling agreement on such terms as we determine to be appropriate) which we then customarily use in granting renewal franchises for DirectBuy centers, and you and your Owners must execute general releases in form and substance satisfactory to us.  Failure by you (and your Owners) to sign such agreements and releases within 30 days after delivery to you shall be deemed an election by you not to buy a successor franchise for your Center.

**15.04   Your Right To Sell.**  If, after your notice pursuant to Section 15.02, we determine that you do not have the right to renew the Franchise, you then have the right to sell your Center pursuant to Section 13, provided your Center is operated in compliance with this Agreement until the closing of the sale.  Your right to sell your Center is exercisable by delivering to us, within 10 days after delivery of our notice of nonrenewal, a written notice of your election to make a bona fide effort to sell the Center in accordance herewith.

Your right to sell the Center will terminate at the earlier of the expiration date of this Agreement or upon our good faith determination that you have failed to make a bona fide effort to sell your Center or have failed to operate your Center in compliance with this Agreement.

## 16.   EFFECT OF TERMINATION OR EXPIRATION.

**16.01   Payment of Amounts Owed to Us.**  Within 30 days after the effective date of termination or expiration (without renewal) of this Agreement, you agree to pay us and our Affiliates all royalties, Marketing and Legislative Fund contributions, amounts owed for purchases from us or our Affiliates, interest due on any of the foregoing and all other amounts owed to us or our Affiliates which are then unpaid.

**16.02   Discontinue Use of Marks and System.**  Upon the termination or expiration (without renewal) of this Agreement, you will:

       (a)  not directly or indirectly at any time or in any manner use any Mark, any colorable imitation or other indicia of a DirectBuy center;

(b) take such action as may be required to cancel all fictitious or assumed name registrations relating to your use of any Mark;

(c) notify the telephone company and all telephone directory publishers of the termination or expiration of your right to use any telephone number and any regular, classified or other telephone directory listings associated with any Mark and to authorize transfer of the number to us or at our direction;

(d) remove from the Premises, and discontinue using for any purpose, all signs, fixtures, furniture, decor items, marketing, advertising and solicitation materials, membership forms and other materials and supplies which display any of the Marks or any distinctive features, images, or designs associated with DirectBuy centers and, at your expense, make such alterations as may be necessary to distinguish the Premises so clearly from its former appearance as a DirectBuy center as to prevent any possibility of confusion by the public;

(e) immediately cease to use all Confidential Information and return to us all copies of the Marketing and Merchandise Ordering Materials, the Operating Manual and any other materials which have been loaned to you;

(f) immediately discontinue any mode of communications on the Internet directly or indirectly relating to your Center, including any Web sites or pages associated with your Center, and immediately take all steps required by us to transfer any domain name associated with your Center to us. You irrevocably appoint the person who is then our president as your duly authorized agent and attorney-in-fact to execute all instruments and take all steps to transfer such domain names;

(g) not directly or indirectly communicate to anyone any information about us, any of our affiliates or our officers, directors, or employees, or your former association with any of them through the Internet, except: (i) to respond to inquiries posed to you by prospective franchisees of ours in connection with their investigation of the franchise opportunity; and (ii) to communicate directly with members of your Center to notify them of the status of their memberships and any pending orders, which communications shall not be made generally accessible to third parties; and

(h) within 30 days after the effective date of termination or expiration, furnish us evidence satisfactory to us of your compliance with the foregoing obligations.

·**16.03   Our Right To Retrieve Materials**. Upon expiration (without renewal) or termination of this Agreement, we have the right to immediately enter the Premises or any other premises where any of the Marketing and Merchandise Ordering Materials and copies of the Operating Manual may be found, with or without prior notice and forcibly, if necessary, and to take possession of and remove, without legal process, all such Marketing and Merchandise Ordering Materials and copies of the Operating Manual and any signs leased to you. You hereby waive any claim or right of action for trespass or other tort or criminal act or damages caused by reason of such entry or removal.

**16.04   Our Right To Solicit Your Members**.  We and other franchisees of DirectBuy centers have the unrestricted right to solicit and send mail to members of your Center upon expiration (without renewal) or termination of this Agreement.

**16.05   Our Option To Purchase Remaining Memberships**.  Upon expiration (without renewal) or termination of this Agreement, we have the option to purchase your rights accruing after the Option Exercise Date (as defined below) under membership agreements for your Center then in effect (the  "Remaining Memberships") in consideration of the assumption of your contractual obligations accruing after the Option Exercise Date under the Remaining Memberships. Our option is exercisable by delivering written notice to you within 30 days of the effective date of termination or expiration (without renewal) of this Agreement, as applicable, and such written notice constitutes an agreement between us (or our assignee) and you, effective as of the delivery date of such notice (the "Option Exercise Date"), that you assign, and we (or our assignee) assume, all your rights and obligations accruing from and after the Option Exercise Date under the Remaining Memberships.  We have the unrestricted right to assign our option to purchase separate and apart from the remainder of this Agreement.

**16.06   Continuing Obligations**.  All obligations under this Agreement which expressly or by their nature survive the expiration or termination of this Agreement shall continue in full force and effect until they are satisfied in full or by their nature expire.

## 17.   RELATIONSHIP OF THE PARTIES.

**17.01   Independent Contractors**.  Franchisor and Franchisee, as between themselves, are and shall be independent contractors.  Neither this Agreement nor the dealings of the parties pursuant to this Agreement shall create any fiduciary relationship or any other relationship of trust or confidence.

Nothing contained in this Agreement, or arising from the conduct of the parties hereunder, is intended to make either party a general or special agent, joint venturer, partner or employee of the other for any purpose whatsoever.  You agree to conspicuously identify yourself in all dealings with members, lessors, contractors, suppliers, public officials, employees and others as the owner of your Center.  You agree to place such other notices of independent ownership on membership forms, purchase orders, business cards, stationery, marketing, advertising and solicitation materials and other materials as we may require from time to time.

You may not make any express or implied agreements, warranties, guarantees or representations or incur any debt in our name or on our behalf or represent that the relationship of the parties hereto is anything other than that of independent contractors.  We will not be obligated by or have any liability under any agreements made by you with any third party, including members of your Center or for any representations made by you to any third party including members and prospective members of your Center.  We will not be obligated for any damages to any person or property arising directly or indirectly out of the operation of your business hereunder.

17.02  **Indemnification**. You agree to indemnify and hold harmless to the fullest extent permitted by law, Franchisor, its Affiliates and their respective directors, officers, employees, shareholders, agents, successors and assigns (collectively "indemnitees") from any and all losses and expenses (as hereinafter defined) incurred in connection with any litigation or other form of adjudicatory procedure, claim, demand, investigation, or formal or informal inquiry (regardless of whether it is reduced to judgment) or any settlement thereof which arises directly or indirectly from, as a result of, or in connection with your development or operation of your Center (collectively "event"), and regardless of whether it resulted from any strict or vicarious liability imposed by law on the indemnitees, provided, however, that this indemnity shall not apply to any liability arising from the gross negligence or willful acts of indemnitees (except to the extent that joint liability is involved, in which event the indemnification provided herein shall extend to any finding of comparative or contributory negligence attributable to Franchisee). The term "losses and expenses" shall be deemed to include compensatory, exemplary, and punitive damages; fines and penalties; attorneys' fees; experts' fees; court costs; costs associated with investigating and defending against claims; settlement amounts; judgments; compensation for damages to our reputation and goodwill; and all other costs associated with any of the foregoing losses and expenses. You agree to give us prompt notice of any event of which you are aware for which indemnification is required, and, at your expense and risk, we may elect to assume (but under no circumstance obligated to undertake) the defense and/or settlement thereof, provided that we will seek your advice and counsel. Our assumption of the defense does not modify your indemnification obligation. We may, in our sole judgment, take such actions as we deem necessary and appropriate to investigate, defend, or settle any event or take other remedial or corrective actions with respect thereof as may be, in our sole judgment, necessary for the protection of the indemnitees or DirectBuy centers generally. This section shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

17.03  **Taxes**. You agree to promptly pay to us an amount equal to all taxes levied or assessed, including unemployment taxes, sales taxes, use taxes, withholding taxes, excise taxes, personal property taxes, intangible property taxes, gross receipt taxes, taxes on royalties, any similar taxes or levies, imposed upon or required to be collected or paid by us by reason of the furnishing of products, intangible property (including trademarks) or services to you. In the event of a bona fide dispute as to your liability for taxes, you may contest your liability in accordance with applicable law. In no event, however, will you permit a tax sale, seizure, or attachment to occur against your Center or any of its assets.

## 18.  MISCELLANEOUS.

18.01  **Governing Law**. This agreement and all issues arising from or relating to this Agreement shall be governed by and construed under the laws of the State of Indiana, provided the foregoing shall not constitute a waiver of your rights under any applicable franchise law of another state. Otherwise, in the event of any conflict of law, Indiana law will prevail, without regard to the application of Indiana conflict of law principles. However, if any provision of this Agreement would not be enforceable under Indiana law, and if your Center is located outside of Indiana and such provision would be enforceable under the laws of the state in which your Center is located, then such provision shall be construed under the laws of that state.

18.02  **Exclusive Jurisdiction**. You and each of your Owners agree that the U.S. District Court for the Northern District of Indiana, or if such court lacks jurisdiction, the Superior Court (or its successor) for Lake County, Indiana shall be the venue and exclusive forum in which to adjudicate any case or controversy arising from or relating to this Agreement and any guarantees by your Owners. You and each of your Owners irrevocably submit to the jurisdiction of such courts and waive any objections to either the jurisdiction of or venue in such courts.

18.03  **Injunctive Relief**. We may obtain at any time in any court of competent jurisdiction any injunctive relief, including temporary restraining orders and preliminary injunctions, against conduct or threatened conduct for which no adequate remedy at law may be available or which may cause us irreparable harm. We may have such injunctive relief, without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law, and your sole remedy in the event of the entry of such injunction, shall be the dissolution of such injunction, if warranted, upon hearing duly had (all claims for damages by reason of the wrongful issuance of any such injunction being expressly waived hereby). You and each of your Owners acknowledges that any violation of Sections 10, 11, 13.02(i), 16.02 or 16.03 would result in irreparable injury to us for which no adequate remedy at law may be available. Accordingly, you and each of your Owners consents to the issuance of an injunction at our request (without posting a bond or other security) prohibiting any conduct in violation of any of those sections and agree that the existence of any claims you or any of your Owners may have against us, whether or not arising herefrom, shall not constitute a defense to the enforcement of any of those Sections.

18.04  **Costs and Attorneys' Fees**. If we claim in any judicial proceeding that you owe us or any of our Affiliates money or that you have otherwise breached this Agreement and we prevail on such claims, then we shall be awarded our costs and expenses incurred in connection with such proceedings, including reasonable attorneys' fees.

18.05  **Limitations on Legal Claims**. Except with respect to any of your obligations herein regarding the Confidential Information and the Marks, Franchisor and Franchisee (and its Owners) each waives, to the fullest extent permitted by law, any right to or claim for any punitive or exemplary damages against the other. You and each of your Owners waive, to the fullest extent permitted by applicable law, the right to recover consequential damages for any claim directly or indirectly arising from or relating to this Agreement. Furthermore, the parties agree that any legal action in connection with this Agreement shall be tried to the court sitting without a jury, and all parties waive any right to have any action tried by jury.

18.06  **Severability and Substitution of Provisions**. Every part of this Agreement shall be considered severable. If for any reason any part of this Agreement is held to be invalid, that determination shall not impair the other parts of this Agreement. If any covenant herein which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of geographical area, type of business activity prohibited and/or length of time, but could be rendered enforceable by reducing any part or all of it, you and we agree that it will be enforced to the fullest extent permissible under applicable law. If any applicable law requires a greater prior notice of the termination of or refusal to enter into a successor franchise than is required hereunder, a different standard of "good cause", or the taking of some other action not required hereunder, the prior notice, "good cause" standard and/or other action required by such law shall be substituted for the

comparable provisions hereof. If any provision of this Agreement or any specification, standard or operating procedure prescribed by us is invalid or unenforceable under applicable law, we have the right, in our sole discretion, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to make it valid and enforceable.

    **18.07   Waiver of Obligations**. We and you may by written instrument unilaterally waive or reduce any obligation of the other under this Agreement. Any waiver granted by us shall be without prejudice to any other rights we may have, will be subject to continuing review by us and may be revoked, in our sole discretion, at any time and for any reason, effective upon delivery to you of 10 days' prior notice. You and we shall not be deemed to have waived any right reserved by this Agreement by virtue of any custom or practice of the parties at variance with it; any failure, refusal or neglect by you or us to exercise any right under this Agreement (except as provided in Section 18.08) or to insist upon exact compliance by the other with its obligations hereunder; any waiver, forbearance, delay, failure or omission by us to exercise any right, whether of the same, similar or different nature, with respect to other DirectBuy centers; or the acceptance by us of any payments due from you after any breach of this Agreement.

    **18.08   Exercise of Rights**. The rights of Franchisor and Franchisee hereunder are cumulative and no exercise or enforcement by Franchisor or Franchisee of any right or remedy hereunder shall preclude the exercise or enforcement by Franchisor or Franchisee of any other right or remedy hereunder which Franchisor or Franchisee is entitled to enforce by law. Notwithstanding the foregoing, and except as otherwise prohibited or limited by applicable law, any failure, neglect, or delay of a party to assert any breach or violation of any legal or equitable right arising from or in connection with this Agreement shall constitute a waiver of such right and shall preclude the exercise or enforcement of any legal or equitable remedy arising therefrom, unless written notice specifying such breach or violation is provided to the other party within 12 months after the later of: (a) the date of such breach or violation; or (b) the date of discovery of the facts (or the date the facts could have been discovered, using reasonable diligence) giving rise to such breach or violation.

    **18.09   Construction**. The language of this Agreement shall be construed according to its fair meaning and not strictly against any party. The introduction, personal guarantees, exhibits and riders (if any) to this Agreement, as well as the Operating Manual, are a part of this Agreement, which constitutes the entire agreement of the parties. Except as otherwise expressly provided herein, there are no other oral or written agreements, understandings, representations or statements relating to the subject matter of this Agreement, other than the franchise offering circular, that either party may or does rely on or that will have any force or effect. Nothing in this Agreement shall be deemed to confer any rights or remedies on any person or legal entity not a party hereto. This agreement shall not be modified except by written agreement signed by both parties.

    The headings of sections are for convenience only and do not limit or construe their contents. The word "including" shall be construed to include the words "without limitation." The term "Franchisee" or "you" is applicable to one or more persons, a corporation, limited liability company or a partnership and its owners, as the case may be. If two or more persons are at any time Franchisee hereunder, whether as partners, joint venturers or otherwise, their obligations and

liabilities to us shall be joint and several. References to a controlling interest in an entity shall mean more than fifty percent (50%) of the equity and voting control of such entity.

This agreement is binding on the parties hereto and their respective executors, administrators, heirs, assigns and successors in interest. This agreement may be executed in multiple copies, each of which shall be deemed an original. Time is of the essence in this Agreement.

**18.10 Covenant of Good Faith**. If applicable law shall imply a covenant of good faith and fair dealing in this Agreement, the parties agree that such covenant shall not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement. Additionally, if applicable law shall imply such covenant, you acknowledge and agree that (a) this Agreement (and the relationship of the parties which is inherent from this Agreement) grants us the discretion to make decisions, take actions and/or refrain from taking actions not inconsistent with our explicit rights and obligations hereunder that may affect favorably or adversely your interests; (b) we will use our judgment in exercising such discretion based on our assessment of our own interests and balancing those interests against the interests of the owners of DirectBuy centers generally (including ourselves, and our Affiliates and franchisees), and specifically without considering your individual interests or the individual interests of any other particular franchisee; (c) we will have no liability to you for the exercise of our discretion in this manner, so long as such discretion is not exercised in bad faith toward you; and (d) in absence of such bad faith, no trier of fact in any legal action shall substitute its judgment for our judgment so exercised.

**18.11 Approvals and Consents**. Whenever this Agreement requires the approval or consent of either party, the other party shall make written request therefor, and such approval or consent shall be obtained in writing; provided however, unless specified otherwise in this Agreement, such party may withhold approval or consent at its sole discretion.

**18.12 Notices and Payments**. All notices, requests and reports permitted or required to be delivered by this Agreement shall be deemed delivered: (a) at the time delivered by hand to the recipient party (or to an officer, director or partner of the recipient party); (b) on the same day of the transmission by facsimile, telegraph or other reasonably reliable electronic communication system; (c) 1 business day after being placed in the hands of a commercial courier service for guaranteed overnight delivery; or (d) 5 business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to the party to be notified at its most current principal business address of which the notifying party has been notified in writing. All payments and reports required by this Agreement shall be sent to us at the address identified in this Agreement unless and until a different address has been designated by written notice. No restrictive endorsement on any check or in any letter or other communication accompanying any payment shall bind us, and our acceptance of any such payment shall not constitute an accord and satisfaction.

**18.13 Receipt of Offering Circular and Agreement**. You acknowledge having received our franchise offering circular by the earliest of: (1) the first personal meeting to discuss our franchise; or (2) ten business days before signing a binding agreement; or (3) ten business days

before making any payment to us relating to this Agreement. You acknowledge having received
this Agreement, with all blanks completed, at least 5 business days before you signed it.

## [Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed and delivered this
Agreement on the day and year first above written.

UCC TOTALHOME, INC.,                    FRANCHISEE
an Indiana corporation

                                        If a corporation, limited liability company or
                                        partnership:

By:_____      _____
Print Name: Debbie Bowen                (Name of corporation, limited
Title:Vice President Franchise Development    liability company or partnership)

                              By:_____
                              Print Name:_____
                              Title:_____

                              By:_____
                              Print Name:_____
                              Title:_____

                              By:_____
                              Print Name:_____
                              Title:_____

                              By:_____
                              Print Name:_____
                              Title:_____

                    If individuals:


                    (Signature)

                    Thomas Giacchi
                    (Print Name)


                    (Signature)

                    Joyce Giacchi
                    (Print Name)

10/03                                    33
3692043.6/Franchise Agreement 10/30/03

**REVISED**
**SCHEDULE A TO THAT FRANCHISE AGREEMENT BETWEEN UCC** ~~~~
**TOTALHOME, INC. AND** Thomas and Joyce Giacchi **ON** June ~~~~ 9, ~~~~ ~~~~
2004 .

The Marketing Area shall consist of the following geographic area:

In PA.Counties of: Carbon, Lehigh, Northampton. The following zip codes
In Berks: 17087,18011,18056,19503,19504,19505,19506,19507,19510,19512
19518,19522,19526,19529,19530,19533,19534,19539,19541,19547,19555,
19560,19562,19601,19602,19604,19605,19606,19607,19608,19609,19610,
19611.The following zip codes in Schuylkill: 17901,17922,17925,17954,17959
17960,17961,17965,17970,17972,18211,18214,18218,18220,18245,18252,
19549.The following zip codes in Monroe:18058,18301,18321,18322,18327,
18330,18331,18333,18352,18353,18354,18355,18360,18372.

**UCC TOTALHOME, INC.**

By: _____          By: _____
Title:Vice President Franchise Development          Title: _____

_____
Thomas Giacchi

_____
Joyce Giacchi

SCHEDULE A TO THAT FRANCHISE AGREEMENT BETWEEN UCC
TOTALHOME, INC. AND Thomas and Joyce Giacchi ON ___June 9_, 2004 .

The Marketing Area shall consist of the following geographic area:

In PA. Counties of: Carbon, Lehigh, Northhampton. The following zip codes
in Berks: 17087,18011,18056,19503,19504,19505,19506,19507,19510,19512
19518,19522,19526,19529,19530,19533,19534,19539,19541,19547,19555,
19560,19562,19601,19602,19604,19605,19606,19607,19608,19609,19610,
19611. The following zip codes in Schuylkill: 17901,17922,17925,17954,17959
17960,17961,17965,17970,17972,18211,18214,18218,18220,18245,18252,19549.

UCC TOTALHOME, INC.

By:_____

Title: Vice President Franchise Development

By:_____

Title:_____

Thomas Giacchi

Joyce Giacchi

SCHEDULE   B   TO   THAT   FRANCHISE   AGREEMENT   BETWEEN   UCC
TOTALHOME, INC. AND Thomas and Joyce Giacchi ON ___June 9___, 2004___.

    The Center shall be operated at the following premises:
                TO BE DETERMINED

UCC TOTALHOME, INC.

By:_____
Title: Vice President Franchise Development

Date:_____

By:_____
Title:_____

_____
Thomas Giacchi

_____
Joyce Giacchi

Date:___6/9/04_____

## SCHEDULE C    TO THE FRANCHISE AGREEMENT BETWEEN UCC TOTALHOME, INC. AND Thomas and Joyce Giacchi
DATED _____

1.    Operating Partner.  The name, home address and social security number of the Operating        Partner is as follows:

_____    _____

_____

_____.

2.    Form of Entity of Franchisee.

(a)  Corporation or Limited Liability Company.  Franchisee was incorporated on _____, _____, under the laws of the State of _____.  It has not conducted business under any name other than its corporate name.  The following is a list of all of Franchisee's directors and officers as of _____, 20_____.

| Name of Each Director/Officer | Position(s) Held |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

(b) Partnership. Franchisee is a [general] [limited] partnership formed on
_____, _____ under the laws of the State of _____. It
has not conducted business under any name other than its partnership name. The following
is a list of all of Franchisee's general partners as of _____, _____.

Name of General Partner

_____

_____

_____

_____

_____

3.    Owners. Franchisee and each of its Owners represents and warrants that the
following is a complete and accurate list of all Owners of Franchisee, including the full
name, mailing address and social security number of each Owner, and fully describes the
nature and extent of each Owner's interest in Franchisee. Franchisee, and each Owner as to
his ownership interest, represents and warrants that each Owner is the sole and exclusive
legal and beneficial owner of his ownership interest in Franchisee, free and clear of all
liens, restrictions, agreements and encumbrances of any kind or nature, other than those
required or permitted by this Agreement.

| Owner's Name, Address and Social Security Number | Description of Interest |
|---|---|
| Thomas Giacchi 9 Stone Creek LN Whitehouse Station NJ 08889 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 | 50% |
| | |
| Joyce Giacchi 9 Stone Creek Lane Whitehouse Station, NJ 08889 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 | 50% |
| | |
| | |
| | |

Submitted by Franchisee
on ___June 9_____2004___.

Accepted by Franchisor and made a
part of the Franchise Agreement as
of _____

UCC TOTALHOME, INC.

(Name of corporation, limited
liability company or partnership)

By:_____
Print Name:_____
Title:_____

By:_____
Print Name: Debbie Bowen
Title: Vice President Franchise Development

Owners:
_____
(Signature)

Thomas Giacchi
(Print Name)

_____
(Signature)

Joyce Giacchi
(Print Name)

_____
(Signature)

_____
(Print Name)

_____
(Signature)

_____
(Print Name)

10/03.
3692043.6/Franchise Agreement 10/30/03

38

## OWNERS' PERSONAL GUARANTY OF
## FRANCHISEE'S OBLIGATIONS

In consideration of, and as an inducement to, the execution of the Franchise
Agreement dated as of ͞June 9͞     ,2004 (the "Agreement") by and between UCC
TOTALHOME, INC. ("Franchisor"), and Thomas and Joyce Giacchi ("Franchisee"), each
of the undersigned owners of an interest in Franchisee hereby personally and
unconditionally: (1) guarantees to Franchisor and its successors and assigns, for the term of
the Agreement and thereafter as provided in the Agreement, that Franchisee shall
punctually pay and perform each and every undertaking, agreement and covenant set forth
in the Agreement and that each and every representation of Franchisee made in connection
with the Agreement are true, correct and complete in all respects at and as of the time
given; and (2) agrees personally to be bound by, and personally liable for the breach of,
each and every provision in the Agreement.

Each of the undersigned waives: (a) acceptance and notice of acceptance by
Franchisor of the foregoing undertakings; (b) notice of demand for payment of any
indebtedness or nonperformance of any obligations hereby guaranteed; (c) protest and
notice of default to any party with respect to the indebtedness or nonperformance of any
obligations hereby guaranteed; (d) any right he may have to require that an action be
brought against Franchisee or any other person as a condition of liability; and (e) any and
all other notices and legal or equitable defenses to which he may be entitled.

Each of the undersigned consents and agrees that: (i) his direct and immediate
liability under this guaranty shall be joint and several; (ii) he shall render any payment or
performance required under the Agreement upon demand if Franchisee fails or refuses
punctually to do so; (iii) such liability shall not be contingent or conditioned upon pursuit
by Franchisor of any remedies against Franchisee or any other person; and (iv) such
liability shall not be diminished, relieved or otherwise affected by any extension of time,
credit or other indulgence which the Franchisor may from time to time grant to Franchisee
or to any other person including, without limitation, the acceptance of any partial payment
or performance or the compromise or release of any claims, none of which shall in any way
modify or amend this guaranty, which shall be continuing and irrevocable during the term
of the agreement.

**IN WITNESS THEREOF**, each of the undersigned has hereunto affixed his signature, under seal, on the same day and year as the Agreement was executed.

**PERCENTAGE OF OWNERSHIP**
**INTERESTS IN FRANCHISEE**

_50%_

_50%_

**GUARANTOR(S)**

_(signature)_
(Signature)
Thomas Giacchi
(Print Name)

_Joyce Giacchi_
(Signature)
Joyce Giacchi
(Print Name)

_____
(Signature)
_____
(Print Name)

_____
(Signature)
_____
(Print Name)

_____
(Signature)
_____
(Print Name)

DATE: __June 9__, 2004

Subscribed and sworn to before me this __9th__ day of __June__, 2004.

_Katrina a Major_
Notary Public    Katrina a Major

My Commission expires: __10/31/2004__

10/03
3692043.6/Franchise Agreement 10/30/03

40

# *EXHIBIT B*

Rx Date/Time   APR-01-2009(WED) 12:04
APR-01-2009(WED) 11:49   Case 09-21579-reg   Doc 841   Filed 04/29/09   Entered 04/29/09 12:42:06   Desc   P. 002
                          Exhibit A: Beta Finance Agreement   Page 1 of 9                          P. 002/010

## BETA FINANCE AGREEMENT

THIS AGREEMENT is entered into this 9th day of June, 2004, by and among BETA FINANCE COMPANY, Inc., an Indiana corporation, with its principal office at 8450 Broadway, Merrillville, Indiana 46410 ("Beta"), UCC TOTALHOME, INC., an Indiana corporation and an affiliate of Beta, with the same address ("UCC"), and _____, a(n) _____, whose principal address is _____, and Tom & Joyce Giacchi _____ (collectively "Franchisee").

## 1.   INTRODUCTION

1.01   Franchisee's Center. UCC and Franchisee have executed a Direct Buy franchise agreement dated June 9, 2004 (the "Franchise Agreement") pursuant to which Franchisee has been granted the right to own and operate a franchised Direct Buy center.

1.02   Financing of Franchisee's Membership Sales. In connection with its Direct Buy center, Franchisee enters into retail installment contracts ("Contracts") with its members ("members" or "debtors") to finance their purchase of memberships for Franchisee's Direct Buy center. Franchisee desires to finance these Contracts in accordance with the terms and conditions set forth herein.

## 2.   FINANCE PROGRAM

2.01   Standard Finance Program. The parties hereto agree to the terms and conditions of the standard finance program set forth in Appendix A (the "Standard Program") as of the Effective Date. For purposes of this Agreement, the "Effective Date" shall be the later to occur of: (a) the first day of the month following the date of this Agreement; and (b) if at the time this Agreement is executed, Franchisee's Direct Buy center is not yet open, the date on which Franchisee's Direct Buy center opens for business under Franchisee's ownership. The Standard Program is subject to all of the terms and conditions contained in this Agreement and if there is a conflict between the terms of the Standard Program and this Agreement, the provisions of this Agreement shall prevail.

## 3.   SUBMISSION AND CLASSIFICATION OF CONTRACTS

3.01   Submission of Contracts. Franchisee shall submit to Beta any and all Contracts, in original form, used by Franchisee to finance the purchase of memberships for its Direct Buy center within five (5) business days after the date of execution by the debtors thereof. Such Contracts shall conform to the requirements which Beta may establish from time to time. Beta shall review each Contract and evaluate the creditworthiness of the debtors thereof.

3.02   Classification of Contracts. Beta shall determine whether to classify a Contract as a "Beta II Contract," a "Beta III Contract" or "Beta IV Contract," or whether to reject such Contract. All Contracts which Beta rejects shall be returned to Franchisee for collection, and Beta shall have no right, title or interest whatsoever in such Contracts. Any Contract submitted

10/03
3692050.5/BETA Franchise Agreement

EXHIBIT A

Rx Date/Time                APR-01-2009(WED) 13:04                                   P. 003
APR-01-2009(WED) 14:43  Sep 09 2009 79-reg   Doc 89 11   Filed 04/29/09  Douglas & Ratins & Assoc   Entered 04/29/09 15:42:06   Desc P. 003/010
                          Exhibit A: Beta Finance Agreement   Page 2 of 9

to Beta later than twenty-one (21) days after its execution by the debtor thereof may be automatically classified as a Beta II Contract, or rejected and returned to Franchisee, at Beta's sole discretion. Prior to submitting Contracts to Beta, Franchisee shall execute the assignment provision on the back of each Contract, the effect of which shall be to offer to Beta an assignment (with recourse) of such Contract. If Beta classifies the Contract as a Beta III Contract or Beta IV Contract, or if Beta accepts an assignment thereof (whether full or partial), Beta shall advise Franchisee of its acceptance of the assignment.

   3.03   Criteria and Limits on Financing. Beta will establish from time to time, in its sole and absolute discretion, the acceptable total dollar amount of all of Franchisee's outstanding Beta II Contracts, Beta III Contracts and Beta IV Contracts. The classification of any Contract is at Beta's sole and absolute discretion, and may include factors other than the creditworthiness of the debtors under the Contracts, such as the financing terms granted to debtors, Franchisee's compliance with all requirements under the Franchise Agreement, Franchisee's maintenance of financial standards required by Beta and the aggregate amount of Contracts from all Direct Buy centers that Beta has classified as Beta II Contracts, Beta III Contracts and Beta IV Contracts.

## 4.   RIGHTS OF BETA AND UCC

   4.01   Right to Offset. Beta shall have the right, at its sole discretion, and Franchisee hereby irrevocably and unconditionally authorizes Beta, on Franchisee's behalf, to hold and apply any payments due and owing to Franchisee with respect to any Contracts and any reserve funds to any indebtedness of Franchisee for any and all charges, fees or other amounts due and owing to Beta, UCC or any of their respective affiliates of whatever nature, including, without limitation, all charges, fees and other amounts due under this Agreement (e.g., processing fees, reserves) and the Franchise Agreement (e.g. royalty fees). Franchisee hereby irrevocably and unconditionally authorizes Beta, on Franchisee's behalf, to pay from amounts due to Franchisee hereunder, all franchise fees, royalty fees and all other amounts payable in connection with the Franchise Agreement or in connection with any other agreement entered into with UCC or any of its affiliates. The foregoing rights shall survive the termination of this Agreement.

   4.02   Security Interest. In order to secure all of Franchisee's obligations to Beta, UCC and all of their respective affiliates, including, without limitation, all payment obligations for money owed or indebtedness deferred and any payment or performance obligations, howsoever evidenced (collectively, the "obligations"), Franchisee hereby grants to Beta and UCC, for themselves and as agents for their respective affiliates, a continuing security interest in all Beta II Contracts, Beta III Contracts and Beta IV Contracts, and in any and all replacements thereof, whether now existing or hereafter arising, and any and all proceeds thereof, and all reserve funds held in connection with Beta III Contracts and Beta IV Contracts, and in all books and records related thereto (the "Beta Collateral"). Franchisee acknowledges that Beta's possession of the Beta Collateral shall constitute perfection of such security interests as provided in the Uniform Commercial Code. In the event Franchisee fails to meet any of its obligations to Beta, UCC or any of their respective affiliates, or if there occurs any default in any of the obligations to Beta, UCC or any of their respective affiliates, Beta and UCC, for themselves and as agents for their respective affiliates, shall have all the rights and remedies with respect to the Beta Collateral provided to a secured party under the Uniform Commercial Code or other applicable law,

- 2 -

Rx Date/Time   APR-01-2009(WED) 12:04   Filed 04/29/09   Douglas M. Marburger 45:05   Desc   P. 004
APR-01-2009(WED)12:04   Doug/Doc 89   Plaintiff's to Issue   EXHIBIT 10 439 0530 :42:06   P. 004/010
Exhibit A: Beta Finance Agreement   Page 3 of 9

provided that if the Beta Collateral is sold or otherwise disposed of after any breach or default, Franchisee shall be liable for any deficiency and for all costs and expenses incurred in enforcing Beta's and UCC's rights and remedies in the Beta Collateral. Further, Franchisee agrees to execute and deliver to Beta and UCC any financing statements, continuation statements and such other documents and to take such actions as may be necessary or appropriate, in Beta's and UCC's sole discretion, to create, evidence, perfect, continue or give effect to the security interests granted herein. Franchisee hereby irrevocably appoints Beta as Franchisee's attorney in fact for the purpose of executing such documents and taking such actions. The security interests granted herein will survive the termination of this Agreement.

## 5.   MISCELLANEOUS

5.01   Term and Termination. This Agreement shall continue until terminated by any party hereto, and may be terminated by any party hereto at any time, with or without cause, effective upon delivery of notice of termination. Upon termination of this Agreement, Beta shall continue to service and collect Beta II Contracts previously accepted under this Agreement in accordance with the applicable provisions of this Agreement until all Beta II Contracts have either been paid in full or returned and shall continue to maintain ownership of Beta III Contracts and Beta IV Contracts (and Beta II Contracts, if applicable) which had previously been assigned in accordance with the applicable provisions of this Agreement. At such time that all Beta III Contracts and Beta IV Contracts (and Beta II Contracts, if applicable) have either been paid in full or reassigned to Franchisee, and all of Franchisee's obligations to Beta, UCC and all of their respective affiliates have been paid in full, Beta shall remit to Franchisee any amounts remaining in any reserve funds.

5.02   Indemnity. Franchisee hereby agrees to indemnify and hold Beta and UCC, and their respective subsidiaries, affiliates, stockholders, directors, officers, employees, agents and assignees harmless against, and to reimburse them for, any loss, liability, taxes or damages (actual or consequential) and all reasonable costs or expenses of defending any and all liabilities, liens, damages, claims (including, without limitation, any cross-claim and counterclaim and any claim asserted as a defense) demands, actions, losses, court costs, fees and expenses of every kind and nature ("Claims") whether in contract or in tort, and claims alleging their negligence, including any and all Claims arising at any time or times hereafter, brought against any of them or any action in which any of them is named as a party (including, without limitation, reasonable accountants', attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses) which any of them may suffer, sustain or incur by reason of, arising from or in connection with any Contract, including any assertion that any Contract, or the manner in which any Contract was obtained, violates any law or regulation or is unenforceable for any reason or that Beta is an assignee of any Beta II Contract.

The foregoing indemnity shall continue in full force and effect subsequent to and notwithstanding the termination of this Agreement.

5.03   Relationship of Parties. The parties shall be independent contractors and nothing in this Agreement is intended to make any party a general or special agent, legal representative,

- 3 -

10/03
3692050.5/BETA Franchise Agreement

Rx Date/Time  APR-01-2009(WED) 12:04
APR-01-2009(WED) 14:47    Case 09-20579-reg  Doc 89-51  Filed 04/29/09  Entered 04/29/09 12:42:06  Desc
Exhibit A: Beta Finance Agreement   Page 4 of 9     P.005
P.005/010

trustee, fiduciary, subsidiary, joint venturer, partner, employee or servant of any other party for any purpose.

    5.04   Waiver. The waiver by any party of a breach of a provision of this Agreement by another shall only be effective if in writing and signed by the party to be charged therewith and shall not be construed as a waiver of any subsequent breach by such other party.

    5.05   Entire Agreement. This Agreement contains the entire agreement between the parties with respect to the matters set forth herein. All prior discussions, understandings, negotiations and agreements are merged herein. This Agreement may not be orally changed, but may only be changed by an agreement to such effect in writing signed by the party against whom enforcement of same is sought. Except as otherwise expressly provided herein, nothing in this Agreement is intended, nor shall be deemed to confer any rights or remedies upon any person or legal entity not a party hereto. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. The validity, construction and enforceability of this Agreement shall be governed by the internal laws (but not the choice of laws) of the State of Indiana.

    5.06   Assignment. This Agreement is fully assignable by Beta and UCC. Franchisee may not voluntarily, involuntarily, directly or indirectly assign, sell, or otherwise transfer this Agreement or any rights hereunder without Beta's and UCC's prior written approval.

    5.07   Notices. All notices permitted or required to be delivered by this agreement shall be deemed delivered: (a) at the time delivered by hand to the recipient party (or to an officer, director or partner of the recipient party); (b) on the same day of the transmission by facsimile, telegraph or other reasonably reliable electronic communication system; (c) 1 business day after being placed in the hands of a commercial courier service for guaranteed overnight delivery; or (d) 5 business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to the party to be notified at its most current principal business address of which the notifying party has been notified in writing.

10/03
3692050.5/BETA Franchise Agreement

Rx Date/Time 09-20-2009(SUN) 04:21 04 Filed 04/29/09 Document N 04/29/09 12:02:06   Desc P. 006
APR-01-2009(WED) 11:47   Haynies A Marias, A Assoc   FAX No. 03 08   P. 006/010
Exhibit A: Beta Finance Agreement   Page 5 of 9

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered on the day and year first above written.

a _____ corporation

By:_____
Title:_____

_____
individually

Joyce Fiacchi
_____
individually

BETA FINANCE COMPANY, INC.,
an Indiana corporation

By:_____
Title: President

UCC TOTALHOME, INC.,
an Indiana corporation

By:_____

Title: Vice President Franchise Development

10/03
3692050.5/BETA Franchise Agreement

Rx Date/Time    APR-01-2009(WED) 12:04
APR-01-2009(WED) 14:47 rec ... Doc 89-1    Filed 04/29/09    Douglas M Martens A DFSPS    Desc   P. 007
                                Exhibit A: Beta Finance Agreement    Page 6 of 9   P. 007/010

## APPENDIX A
## STANDARD FINANCE PROGRAM

**1.    PROCESSING FEES**

Franchisee shall pay Beta a processing fee of Ten Dollars ($10.00) for each Contract classified as a Beta II Contract and Twenty-Five Dollars ($25.00) for each Contract classified as a Beta III Contract or Beta IV Contract.

**2.    BETA II CONTRACTS**

For all Contracts which are classified as Beta II Contracts, the following terms and conditions shall apply:

2.01    Beta shall service and collect the Beta II Contracts on Franchisee's behalf in accordance with the terms of this Appendix A. Beta shall hold the Beta II Contracts for purposes of such service and collection, but shall not accept the assignment of such Beta II Contracts. Franchisee shall not make any efforts to collect, nor authorize any one else to attempt to collect, any Beta II Contract while Beta is servicing and seeking to collect on such Contract.

2.02    Beta shall deliver a payment book or monthly statements to the debtor, receive payments from the debtor and, if required, send notices of default to the debtor of each Beta II Contract. Beta shall make reasonable efforts, in conformance with its standard practices (as may be modified from time to time at its sole discretion), to collect defaulted payments under any of the Beta II Contracts; provided however, that Beta shall have no obligation to institute any legal action or to engage any collection agency to collect any defaulted payments.

2.03    Beta shall provide Franchisee with periodic reports on collections and applications of payments in accordance with Beta's standard practices.

2.04    For the billing and collection services Beta performs with respect to Beta II Contracts, and in addition to any other amounts payable hereunder, Franchisee shall pay Beta an amount equal to all interest, penalties and other charges paid by Beta II Contract debtors under all such Contracts accepted pursuant hereto.

2.05    With respect to each new membership for which the member's fees are financed through a Beta II Contract, the royalty fee due under the Franchise Agreement on such membership shall be deferred and payable to UCC in equal monthly installments over the term of the Contract.

2.06    The balance of the principal collected on Beta II Contracts after all applicable offsets, deductions and payments (e.g., processing fees, royalty fees, funding of the Reserve for Beta III Contracts, Beta IV Contracts, UCCOnline fees, and general bills) shall be remitted to Franchisee on a monthly basis, without interest, in accordance with Beta's standard practices.

A-1

10/03
3G92050.5/BETA Franchise Agreement

Rx Date/Time 09-2009781-rep009450 03 04 Filed 04/29/09 Entered 04/29/09 12:42:06    Desc P.008
APR-01-2009(WED) 11:50        Exhibit A: Beta Finance Agreement    Page 7 of 9    P.008/010

2.07    In the event a debtor under a Beta II Contract fails to timely make all required payments within one hundred twenty (120) days after the date of the Contract, or has three (3) or more monthly payments past due at any time, Beta may discontinue servicing that Beta II Contract by returning the Beta II Contract and related documents to Franchisee for collection. To cover Beta's costs, for each Beta II Contract returned, Franchisee shall pay Beta a fee of: (a) Sixty Dollars ($60.00) for each such returned Beta II Contract as to which the debtor has made no payment; and (b) Thirty Dollars ($30.00) for each such returned Beta II Contract as to which the debtor has made only one (1) payment.

2.08    If Beta under any circumstances determines to discontinue servicing a Beta II Contract and returns it to Franchisee for collection, Franchisee may engage, or may authorize Beta to engage, on Franchisees behalf, a collection agency to collect on the Contract.

## 3.    BETA III AND IV CONTRACTS

For all Contracts which are classified as Beta III Contracts or Beta IV Contracts, the following terms and conditions shall apply:

3.01    Franchisee will assign with recourse to Beta all of Franchisee's right, title and interest in and to all Beta III Contracts and Beta IV Contracts, and Beta will accept the foregoing assignment.

3.02    Beta shall establish a reserve account (the "Reserve") and shall allocate to the Reserve the appropriate required percentage (as described below) of the principal amount financed under each Beta III Contract or Beta IV Contract. The allocation to the Reserve will be a percentage determined from time to time by Beta at its sole discretion on the date of this Agreement and on each December 31st and June 30th thereafter, which will be not less than eight percent (8%) nor more than fifteen percent (15%). Beta shall allocate to the Reserve the appropriate percentage of the principal amount financed under each Beta III Contract or Beta IV Contract classified and accepted after the date of each such determination. On December 31st and June 30th of each year, Beta shall reconcile the Reserve by calculating the aggregate outstanding principal balance under all Beta III Contracts and Beta IV Contracts, and paying Franchisee any amounts allocated to the Reserve which exceed the required Reserve, provided the percentage of Contracts which are delinquent thirty (30) days or more does not exceed the required reserve percentage. Beta shall have the right to use funds allocated to the Reserve to pay any and all obligations and indebtedness of Franchisee to Beta, UCC and their respective affiliates, including without limitation, Franchisee's obligation to repurchase defaulted Beta III Contracts and Beta IV Contracts, as provided in Section 3.05, below.

3.03    With respect to each new membership for which the member's fees have been financed through a Beta III Contract or Beta IV Contract, the royalty fee due under the Franchise Agreement on such membership shall be deferred and payable on the date that Beta pays Franchisee for the assignment of such Beta III Contract or Beta IV Contract.

A-2

Rx Date/Time   APR-01-2009(WED) 12:04
APR-01-2009(WED) 11:51
Case 09-20579-reg   Doc 99-1   Filed 04/29/09   Entered 04/29/09 13:42:06   Desc
Exhibit A: Beta Finance Agreement   Page 8 of 9
P. 009
P. 009/010

3.04     The balance of the principal amount financed under each Beta III Contract or Beta IV Contract after all applicable offsets, deductions and payments (e.g., processing fees, deferred portion of the franchise fee, royalty fees and funding of the Reserve), shall be remitted to Franchisee within five (5) business days after classification and acceptance of the Beta III Contract or Beta IV Contract.

3.05     Franchisee acknowledges and agrees that the assignment of Beta III Contracts and Beta IV Contracts is made with recourse. In the event a debtor under a Beta III Contract or Beta IV Contract fails to make any required payment within one hundred twenty (120) days after its due date, Beta may reassign such Beta III Contract or Beta IV Contract to Franchisee, and Franchisee hereby accept the reassignment of such Beta III Contract or Beta IV Contract. In consideration of such reassignment, Franchisee shall pay Beta the unpaid balance of principal and accrued interest as of the date of the reassignment, based on the computation method set forth in such Contract.

4.     ROYALTY TRANSFER

In the event that a member does not timely make the first three (3) payments required under a Beta III Contract or Beta IV Contract, UCC agrees not to charge Franchisee a royalty fee on such membership sale under the Franchise Agreement, and UCC agrees, at its discretion, to: (a) credit the amount of royalties paid by Franchisee for such membership sale to future royalty fees owed by Franchisee to UCC under the Franchise Agreement; or (b) credit such amounts against other payments owed to UCC or any of its affiliates.

Rx Date/Time   09  APR-01-2009(WED) 12:04
APR-01-2009(WED) 17:52.
Case 09-21579-reg   Doc 94-1  Filed 04/29/09   Entered 04/29/09 12:42:06   Desc
Mountain Marigold & Assoc.                                        P. 010
Exhibit A: Beta Finance Agreement   Page 9 of 9
Douglas M Mun/page d  Assoc          P. 010
                                     P. 010/010

## BANK AUTHORIZATION

       The undersigned hereby irrevocably authorizes _____
("the Bank") to provide all information, including without limitation, account numbers, bank
statements and copies of canceled checks, to UCC Total Home, Inc. or its representative ("UCC
Total Home"), as UCC Total Home may request from time to time, with respect to all accounts the
undersigned now has, or in the future has, with the Bank, including without limitation the following
accounts: _____.
The undersigned releases the Bank and agrees to hold the Bank harmless from any claims relating
to the disclosure of the foregoing information to UCC Total Home.


a _____ corporation


By: _____

Title: _____


_____
personally


_____
personally